No. 15-2867

UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

DAVID RHEIN,
Plaintiff-Appellant,

v.

LIEUTENANT JOHN COFFMAN,
Defendant-Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION
CASE NO. 13 C 843
THE HONORABLE GARY FEINERMAN, DISTRICT JUDGE

---

## OPENING BRIEF AND APPENDIX OF PLAINTIFF-APPELLANT DAVID RHEIN

---

Richard Dvorak
Dvorak Law Offices, LLC
6262 Kingery Highway, Suite 305
Willowbrook, IL 60527
Ph: (312) 593-7146
Fax: (312) 873-3869
*Attorney for Plaintiff-Appellant*

## CIRCUIT RULE 26.1   DISCLOSURE STATEMENT

Appellate Court No: 15-2867
Short Caption: Rhein v. Coffman

(1)     The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

**David Rhein**

(2)     The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

**Dvorak Law Offices, LLC**

(3)     If the party or amicus is a corporation:

I)      Identify all its parent corporations, if any; and

**N/A**

ii)     list any publicly held company that owns 10% or more of the party's or amicus' stock:

**N/A**

---

Attorney's Signature____s/Richard Dvorak_____     Date:___12/14/15___

Attorney's Printed Name:___Richard Dvorak___

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d) **Yes.**

Address:__6262 Kingery Highway Ste. 305 Willowbrook, IL 60527__

Phone Number:__(312) 593-7146_____     Fax Number:__(312) 873-3869__

E-Mail Address:___richard.dvorak@civilrightsdefenders.com__

# TABLE OF CONTENTS

Disclosure Statement…………………………………………………. Unnumbered

Table of Contents………………………………………………… ……… i

Table of Authorities………………………………………………………… ii

Jurisdictional Statement………………………………………………...………………... 1

Issues Presented for Review ………… ………………………….……………….... 1

Statement of the Case……………………………………………………… ……… 1

Statement of Facts……………………………………………………… ……… 3

Standard of Review ……………………………………………...………10

Summary of the Argument ……………………………………………10

Argument……………………………………………….…………………… 11

Conclusion………………………………………………………… 37

Certificate of Compliance with F.R.A.P. 32(A)(7)……………………………… 38

Circuit Rule 31(e)(1) Certification ……………………………………… 38

Proof of Service ………………………………………………………39

Circuit Rule 30(D) Statement …………………………………………40

Short Appendix ……………………………………………………………..i

# TABLE OF AUTHORITIES

CASES:

*Abbott v. Sangamon County*,
  705 F.3d 706 (7th Cir. 2013) .........................................................28, 35

*Armstrong v. Daily*,
  786 F.3d 529 (7th Cir. 2015)..............................................................32

*Armstrong v. Manzo*,
  380 U.S. 545 (1965).............................................................…...12, 15

*Baird v. Bd. of Educ. For Warren Cmty. Unit Sch. Dist.*
  *No. 205*, 389 F.3d 685, 692 (7th Cir. 2004) ...................….…........12, 32, 34

*Barry v. Barchi*,
  443 U.S. 55 (1979)...........................................................…..........12, 32, 33

*B & B Target Ctr., Inc. v. Figueroa-Sancha*,
  871 F.Supp.2d 71 (D.C. Puerto Rico 2012) ............................…....................24

*Benson v. Allphin*,
  786 F.2d 268 (7th Cir. 1986) ....................…..............28, 29, 30, 31, 32, 33

*Boddie v. Connecticut*,
  401 U.S. 371 (1971) .....................................................................12

*Cleveland Bd. of Educ. v. Loudermill*,
  470 U.S. 532 (1985)................................…...........11, 12, 18, 19, 20, 29 , 32, 33

*Connor v. Reinhard*,
  847 F.2d 384 (7th Cir. 1988) .............................................................32

*Cooper v. Salazar*, 1
  96 F.3d 809 (7th Cir. 1999) ..............................................................13

*D'Acuisito v. Washington*,
  640 F.Supp. 594 (N.D. Ill. 1986) ....................….........................12, 18

*Daniels v. Williams*,
  474 U.S. 327 (1986) ......................................................................18

*FDIC v. Mallen*,
    486 U.S. 230 (1988) ........................................................................11, 27

*Gonzalez-Droz v. Gonzalez-Colon*,
    660 F.3d 1, 13 (1st Cir. 2011) ......................................................... 24

*Hardin v. S.C. Johnson & Son, Inc.*,
    167 F.3d 340 (7th Cir.1999)............................................................. 10

*District of Columbia v. Heller*,
    554 U.S. 570 (2008)...........................................................................21

*Estate of Escobedo v. Bender*,
    600 F.3d 770 (7th Cir.2010) .............................................................28

*Hildebrandt v. Ill. Dep't of Natural Res.*,
    347 F.3d 1014 (7th Cir. 2003) ......................................................... 14

*Hope v. Pelzer*,
    536 U.S. 730 (2002) .....................................................................31, 32

*Kraebel v. New York City Dep't of Housing Preservation & Dev.*,
    959 F.2d 395 (2d Cir. 1992) .............................................................24

*Kuck v. Danaher*

    600 F.3d 159 (2d Cir. 2010) ...............................................22, 23, 37

*Leavell v. Ill. Dep't of Natural Res.*,
    600 F.3d 798 (7th Cir. 2010) ...........................................................12

*Mackey v. Montrym*,
    443 U.S. 1 (1979) ..............................................................................13

*Laborers' Pension Fund v. A & C Envtl., Inc.*,
    301 F.3d 768 (7th Cir. 2002) ...........................................................28

*United States v. Lanier*,
    520 U.S. 259 (1997) ..........................................................................31

*Mathews v. Eldridge*,
    424 U.S. 319 (1976) .........................13, 14, 21, 23, 24, 25, 25, 27, 28, 39, 30

*McDonald v. City of Chicago*,
    561 U.S. 742 (2010) ................................................................... 21, 22

*Melton v. City of Okla. City,*
    879 F.2d 706 (10th Cir. 1989)...................................................................31

*Moore v. Madigan,*
    702 F.3d 933 (7th Cir. 2012) .............................................…........ 22

*Mordi v. Zeigler,*
    770 F.3d 1161 (7th Cir. 2014) ........................................................ 29

*Mullane v. Central Hanover Bank & Trust Co.,*
    339 U.S. 306(1950) .......................................................................... 12

*Narducci v. Moore,*
    572 F.3d 313 (7th Cir. 2009) ........................................................... 35

*Palmer v. Marion Cnty.,*
    327 F.3d 588 (7th Cir. 2003) ........................................................... 14

*Patkus v. Sangamon-Cass Consortium,*
    769 F.2d 1251 (7th Cir. 1985) ........................................................17

*Patterson v. Armstrong County Children and Youth Services,*
    141 F.Supp.2d 512 (W.D. Pa. 2001) ..................................…........ 18, 34

*Pearson v. Callahan,*
    555 U.S. 223 (2009) ........................................................…..............28, 29

*Roth v. Veteran's Admin. of United States,*
    856 F.2d 1401 (9th Cir. 1988) ........................................................ 31

*Schultz v. Baumgart,*
    738 F.2d 231(7th Cir. 1984) ........................................................... 17

*Stypmann v. City & Cnty. Of San Francisco,*
    557 F.2d 1338 (9th Cir. 1977) ........................................................12

*Spinelli v. City of New York,*
    579 F.3d 160 (2d Cir. 2009) ...................................…....................25, 26, 35, 37

*Tavarez v. O'Malley,*
    826 F.2d 671, 674 (7th Cir. 1987) .................................….......17, 20, 29, 30, 32, 33

*Turiano v. Schnarrs,*

904 F.Supp. 400 (M.D. Pa. 1995) ...........................................................34

*Vance v. Peters,*
97 F.3d 987 (7th Cir. 1996) ...................................................................14

*Whitlock v. Brueggemann,*
682 F.3d 567 (7th Cir. 2012) ................................................................15

*Yang v. City of Chicago,*
37 F.3d 282 (7th Cir. 1994) ..................................................................15

*Zinermon v. Burch,*
494 U.S. 113(1990) ....................................................................... 11, 32

STATUTES:

U.S. Const. amend. XIV, §1 ........................................................... 1, 1

28 U.S.C. § 1291 ................................................................................. 1

28 U.S.C. § 1331 ................................................................................. 1

28 U.S.C. § 1983 ................................................................................. 1
...
430 ILCS 65/10(a) .....................................................................9, 13, 17

## JURISDICTIONAL STATEMENT

The district court had subject matter jurisdiction over this federal question pursuant to 28 U.S.C. § 1331. The suit arises under the due process clause of the 14th Amendment, U.S. CONST. amend. XIV, § 1, by way of 42 U.S.C. § 1983. The court entered summary judgment in Defendant-Appellee's favor on August 6, 2015 (Dkt. 101), and Plaintiff-Appellant filed a timely notice of appeal on August 28, 2015 (Dkt. 102). Therefore, this court has appellate jurisdiction pursuant to 28 U.S.C. § 1291.

## ISSUES PRESENTED FOR REVIEW

1. Whether the Defendant, a state official in charge of that state's gun licensing unit, violated the due process rights of the Plaintiff where, after summarily revoking the Plaintiff's license to carry a weapon, without a hearing, he imposed certain arbitrary and onerous conditions on the Plaintiff in order to get that license back, then, after the Plaintiff fulfilled those conditions, the Defendant ignored the Plaintiff's submitted evidence until a judge ordered the reinstatement of the gun license.

2. Whether the district court erred in determining the Defendant was entitled to qualified immunity.

## STATEMENT OF THE CASE

Plaintiff-Appellant David Rhein (hereinafter "the Plaintiff"), a resident of

Sauk Village, Cook County, Illinois, owned several firearms, all of which had been purchased, registered, and kept within the confines of the law for purposes of self-defense and recreation. (Dkt. 77, ¶¶ 1, 3-5) Defendant-appellee ("Coffman") is a member of the Illinois State Police ("ISP"), formerly Chief of the Bureau of Firearm Services (Dkt. 77, ¶ 2). This case arises from Coffman's order to revoke Rhein's FOID Card and firearms (Dkt. 77, ¶¶ 71-72).

As the result of a prior state court action, the ISP returned Rhein's firearms to him (Dkt. 77, ¶¶ 98-101)[1]. Subsequently, the Plaintiff[2] filed this lawsuit in the Northern District of Illinois, alleging an official capacity injunctive-relief claim against the ISP Director and individual capacity claims under the First, Second, Fourth, and Fourteenth Amendments against Coffman and two other ISP officers (Dkt. 1).

The Defendants moved to dismiss (Dkts. 26, 27). The court granted the motion with respect to the official capacity claim, holding that Rhein did not have standing, and denied it with respect to the individual capacity claims (Dkt. 42). This first Order is attached in the Plaintiff's Appendix.

After the district court's ruling on the motion to dismiss, the Plaintiff voluntarily dismissed the First, Second, and Fourth Amendment claims, leaving only the Fourteenth Amendment procedural due process one (Dkt. 64). On it, both

---

[1] The Defendants moved to strike the statements of facts that were in excess of 80 paragraphs, but the court later denied this motion, and allowed these statements to be considered (Dkt.82).
[2] The Plaintiff's wife, Kim Rhein, also filed a suit, since she owned one of the firearms, but she voluntarily dismissed her claim before the court ruled on the parties' cross motions for summary judgment (Dkt. 64).

parties moved for summary judgment, and the court granted Coffman's motion while denying Rhein's (Dkt. 100). This second Order is attached in the Plaintiff's Appendix, and this appeal follows. Although the Plaintiff contends there is an arguable basis for concluding there was not a valid basis for revoking his gun license without a pre-deprivation hearing, on appeal, the Plaintiff will only challenge the portion of the court's order regarding his post-deprivation due process claim, as well as the portion of the court's order granting Coffman qualified immunity.

## STATEMENT OF FACTS

On February 4, 2011, two ISP officers, Agents Summers and Pryor, unexpectedly arrived at Rhein's home, where they interviewed him and seized his Firearm Owner Identification Card ("FOID Card") and firearms, based on the fact that the Plaintiff's allegedly represented a "clear and present danger" due to an alleged mental condition (Dkt. 77, ¶¶ 38-39, 41-44, 59). However, Agents Summers and Pryor testified throughout their interactions with the Plaintiff, he appeared to be calm, he was not acting in an irrational manner, and they had a normal conversation with the Plaintiff (Dkt. 77, ¶¶ 47, 54). Agents Summers and Pryor testified that it did not appear the Plaintiff was someone who suffered from mental illness (Dkt. 77, ¶ 48, 56). Agents Summers and Pryor did not feel they had probable cause to arrest the Plaintiff for any criminal offense at any time during his investigation (Dkt. 77, ¶¶ 49, 55). Nothing about the Plaintiff's behavior on February 4, 2011 would have led Agent Pryor to believe he was a "clear and present

danger" to anyone (Dkt. 77, ¶ 57).

Rhein immediately asked what he needed to do to have his firearms and FOID card returned to him, and the officers told him to follow the instructions included in the letter from Coffman (Dkt. 77, ¶¶ 61-63). That letter arrived three days later, on February 7,[3] and it both notified Rhein of the decision to revoke his FOID card and provided him with information on how to appeal that decision (Dkt. 77, ¶¶ 74, 75).

That standard revocation letter instructs revokees to contact FOID program personnel in Coffman's unit; revokees are not instructed to contact the legal unit. (Dkt. 77, ¶ 74). Coffman explained the standard revocation letter also strongly encourages revokees to obtain a "letter of recommendation from the police department or sheriff's office who handled the [Plaintiff's] incident," a "letter from a psychiatrist . . . attesting to [Plaintiff's] suitability to acquire, possess, and use firearms" and "three or more letters of reference . . . " (Dkt. 77, ¶ 75). Given issues of exposing oneself to liability, Coffman acknowledged that complying with the requests outlined in the revocation letter may mean that a revokee may have to contact "six, seven, eight, nine, ten different doctors before they find somebody that's going to indicate they are suitable." (Dkt. 77, ¶¶ 76). Coffman did not provide a psychiatrist or psychologist through his unit because of the financial burden it would place on the State; instead, Coffman places this burden on the revokee (Dkt.

---

[3] Agent Summers contends he gave a copy of the letter to the Plaintiff on February 4, but the Plaintiff denies this occurred (Dkt. 77, ¶ 60). For purposes of this appeal, this fact is not particularly crucial, but is recited to give this Court some context and understanding of the facts of the case.

77, ¶ 77).  Coffman considers materials sent to his unit, then forwards this information to the legal department, which ultimately decides whether a person is entitled to a hearing (Dkt. 77, ¶ 78).  It could be months or years before a hearing is provided to a revokee (Dkt. 77, ¶ 79).  There is no absolute right under the statute to an in-person hearing (Dkt. 77, ¶ 80).

The events leading up to the revocation of the Plaintiff's gun license and the seizure of his firearms occurred between March 10, 2010, and February 1, 2011 (Dkt. 77, ¶ 9-29).  On March 10, 2010, the Plaintiff went to Illinois State Representative Anthony DeLuca's ("Representative DeLuca") office in Springfield to drop off a packet of documents (Dkt. 77, ¶ 9).  On March 22, 2010, the Plaintiff called Donna Fanning ("Fanning") at Representative DeLuca's Crete office to see if he could leave a copy of the same documents that he provided to the Springfield office, and the Plaintiff later came to the office and slipped them under the door (Dkt. 77, ¶ 10).  Fanning alleges that on this date, the Plaintiff stated, "I am ready to start shooting people" over the phone. (Dkt. 77, ¶ 11).  However, Fanning also conceded the "[c]onversation ended peacefully."  (Dkt. 77, ¶ 12).

On August 3, 2010, the Plaintiff dropped off another packet and Fanning contacted the Crete Police Department regarding the Plaintiff.  (Dkt. 77, ¶ 13).  She turned over the packet of documents that the Plaintiff left to Crete Police Department Detective Sergeant Robert Hill.  (Dkt. 77, ¶ 14).  On September 30, 2010, the Plaintiff allegedly called Representative DeLuca's office, yelled at Fanning and hung up the phone (Dkt. 77, ¶ 15).

On January 14, 2011, the Plaintiff allegedly called Representative DeLuca's office and said he was coming in to the district office (Dkt. 77, ¶ 16). Fanning called the Crete Police Department and left a message for Detective Hill, but the Crete Police Department did not return her call or follow up with her. (Dkt. 77, ¶ 17). *Id.* The Plaintiff arrived, "handed [Fanning] a packet," and then "left without incident." (Dkt. 77, ¶ 18).

On January 25, 2011, the Plaintiff allegedly called Fanning and made various statements, including telling her he was "getting angry" because Representative DeLuca called the Plaintiff and "blew smoke up [Plaintiff's] rear end" and "ignored [Plaintiff's] petition." (Dkt. 77, ¶ 19). The Plaintiff also allegedly stated, "I am not a violent person" and "I am a member of the Illinois State Militia." (Dkt. 77, ¶ 20). Fanning "told [the Plaintiff] that his writings do not ask a specific question, and they are threatening and disrespectful" and that "he needs to rewrite them to ask specific questions in a respectful way that makes sense." (Dkt. 77, ¶ 21). The Plaintiff replied that "he would like to come to the office and discuss what changes should be made to his letters to make them more civil so he can get an answer." (Dkt. 77, ¶ 22). *Id.* Fanning also alleged that the Plaintiff told her he called the Governor and "threatened to 'kick his ass'" because he would not answer his calls. (Dkt. 77, ¶ 23).

Shortly thereafter, the Plaintiff arrived at Representative DeLuca's office and spoke to Fanning for about an hour and presented her with a copy of the original packet he gave Representative DeLuca's secretary in Springfield on March 10, 2010,

containing pages that had previously been received on March 3, 2010 and/or August 3, 2010. (Dkt. 77, ¶ 24). According to Fanning, during this encounter, the Plaintiff "referred to himself as a 'sacrifice lamb' " several times and "kept speaking about 2012 as a year of great significance, of revolution and overthrowing the government and we the people taking it back." (Dkt. 77, ¶ 25). The Plaintiff also allegedly stated he had "never shot anybody in [his] life, and [he] never would shoot anyone, unless [he] is forced to – to protect [his] constitutional rights." (Dkt. 77, ¶ 26).

The last contact with Representative DeLuca's office listed on Fanning's timeline was on February 1, 2011, when the Plaintiff spoke to Fanning over the phone. (Dkt. 77, ¶ 27). The Plaintiff allegedly told Fanning he would "picket [their] parking lot with a group of people who want answers" and that he "cannot understand why the Rep. [sic] won't answer his petition in writing, as many times as he has respectfully asked for answers to his questions." (Dkt. 77, ¶ 28). At no point in Fanning's narrative of the interaction on this date is there any mention of physical threats made by the Plaintiff. (Dkt. 77, ¶ 29).

During this time period, the Plaintiff also left packages at the DeLuca's offices during his visits. Between March 10, 2010 and January 25, 2011, the Plaintiff visited Representative DeLuca's offices approximately four times and delivered a packet of documents each time; Plaintiff delivered one package of documents to Representative DeLuca's Springfield office and three to his Crete office. (Dkt. 77, ¶ 30). All four packets were exactly the same except for the last one, where, according to Plaintiff, he included the Declaration of Independence.

(Dkt. 77, ¶ 31). These packets were also sent to the Governor, Representative Jesse Jackson, and every representative in the federal government from Illinois. (Dkt. 77, ¶ 32).

After having his FOID card revoked and his gun seized on February 4, 2011, the Plaintiff immediately tried to find a psychiatrist who would be willing to evaluate him for his fitness to carry firearms, but he had difficulty finding one, so several months passed before he finally succeeded (Dkt. 77, ¶ 64). The Plaintiff hired an attorney, Joseph Barbaro, to assist him in having his FOID card reinstated (Dkt. 77, ¶ 65). On August 8, 2011, Defendant Coffman received a letter dated August 1, 2011 from the Plaintiff's attorney, Joseph Barbaro, formally requesting reinstatement the Plaintiff's FOID Card. (Dkt. 77, ¶ 81). Attorney Barbaro's letter included a report from Dr. Alan Childs, a licensed psychologist, and three letters of character reference. (Dkt. 77, ¶ 82). Dr. Alan Childs' report stated, "it is my professional and clinical opinion that [the Plaintiff] does not present as an individual that is dangerous to himself or others." (Dkt. 77, ¶ 83). Defendant Coffman did not read the psychological report attached to that letter. (Dkt. 77, ¶ 86).

On September 23, 2011, Defendant Coffman received a letter dated September 19, 2011, from the Plaintiff's attorney requesting a response to his previous letter. (Dkt. 77, ¶ 84). On January 24, 2012, Defendant Coffman received a letter from Attorney Barbaro that was addressed to Director Hiram Grau and dated January 16, 2011. (Dkt. 77, ¶ 85). Defendant Coffman did not interpret

Barbaro's letters as formal requests for a hearing because Barbaro requested the Plaintiff's FOID Card be "reinstated," but he did not specifically request a "hearing." (Dkt. 77, ¶ 87). However, there was no notice provided to the Plaintiff or his attorney in the initial letter to the Plaintiff that he had to use the word "hearing" versus "reinstatement." (Dkt. 77, ¶ 88). Additionally, the FOID Card Act statute that governs FOID card reinstatements makes no distinctions between requests for a hearing or requests of reinstatement of a revokee's FOID Card. 430 ILCS 65/10(a) (Dkt. 77, ¶ 88).

Other than getting a letter or some sort of approval from the police involved in the case, Plaintiff did everything that Defendant Coffman asked of him. (Dkt. 77, ¶ 91). Defendant Coffman did not respond to any of Plaintiff's attorney's letters, despite receiving all of them. (Dkt. 77, ¶ 92). Instead, on January 24, 2012, a memorandum regarding the Plaintiff's "request for a hearing" was sent from Colonel Patrick E. Keen to the Firearms Services Bureau, Defendant Coffman's unit. Ex. C, Def. Coffman Group Ex. No. 3, AGO Bates Stamp No. 87. In February of 2012, Coffman transferred out of the Bureau of Firearm Services to ISP's Division of Operations, at which point he had no more involvement with Rhein's request for a hearing or reinstatement. (Dkt. 77, ¶ 94). On March 11, 2012, in an email from Kathleen Wood of the Firearm Services Bureau, to Deanna Willner, with Mark Bayless and Linette Metzger copied, Kathleen Wood noted that the Plaintiff's "attorney requested a hearing last year, but did not receive a response." (Dkt. 77, ¶ 95). No one in the Firearm Services Bureau, including Defendant Coffman,

completed a document review on the Plaintiff's case to determine if his FOID card privileges should be reinstated (Dkt. 77, ¶ 96).

After getting no response from Defendant Coffman or the Firearm Services Bureau, on April 12, 2012, the Plaintiff initiated a lawsuit in the Circuit Court of Cook County in order have his FOID Card privileges reinstated and his weapons returned. (Dkt. 77, ¶ 98). On June 5, 2012, a letter was signed by Firearm Services Bureau Chief Jessica L. Trame[4] reinstating the Plaintiff's eligibility to retain a FOID card. (Dkt. 77, ¶ 99). On June 6, 2012, this letter was faxed to Assistant State's Attorney Nichole Patton by Sergeant Mark Bayless. (Dkt. 77, ¶ 100). The Plaintiff's firearms were returned on August 29, 2012. (Dkt. 77, ¶ 101).

## STANDARD OF REVIEW

This court reviews a district court's decision to grant summary judgment *de novo. E.g.*, *Hardin v. S.C. Johnson & Son, Inc.*, 167 F.3d 340, 344 (7th Cir. 1999). Summary judgment is appropriate when, after drawing all reasonable inferences in the non-movant's favor, there is no genuine issue of material fact, such that the movant is entitled to judgment as a matter of law. *E.g.*, *id*.

## SUMMARY OF ARGUMENT

The Plaintiff was unquestionably entitled to a post-deprivation hearing; one that was both meaningful and timely. Coffman provided no post-deprivation hearing, imposed arbitrary and onerous conditions as conditions-precedent to even obtaining a hearing, then he ignored the Plaintiff and his attorney when they made several attempts to have his license reinstated. As such, Defendant Coffman

---

[4] Jessica L. Trame took over Defendant Coffman's position after his retirement.

violated Rhein's clearly defined due process rights.

## ARGUMENT

I. **Defendant Coffman denied the Plaintiff his due process rights because, after he revoked the Plaintiff's gun license without a hearing, he then imposed arbitrary and onerous conditions as conditions-precedent to having the Plaintiff's license reinstated, then he ignored the submitted evidence, causing unnecessary delay before the Plaintiff ultimately was forced to go to court to get his license reinstated, almost a year and a half after Coffman first summarily revoked the Plaintiff's license.**

Defendant Coffman denied the Plaintiff his due process rights when, after he summarily revoked the Plaintiff's gun license (and hence, his guns were seized), Coffman then denied the Plaintiff a meaningful and timely post-deprivation hearing. In analyzing due process claims, a court must first determine whether the plaintiff was denied a protected interest, and, if so, "what process is due." *Leavell v. Ill. Dep't of Natural Res.*, 600 F.3d 798, 804 (7th Cir. 2010). Coffman did not dispute in the court below that the Plaintiff had a protectable interest in his gun license and in owning guns, and the court accepted this concession (Dkt. 100, p. 8). Thus, the only issue on appeal is "what process is due," an issue controlled by federal law. *Cleveland Bd. of Education v. Loudermill*, 470 U.S. 532, 538-542 (1985).

The Supreme Court "usually has held that Constitution requires some kind of hearing *before* the State deprives a person of liberty or property." *Zinermon v. Burch*, 494 U.S. 113, 127 (1990) (emphasis in original). In the rare instance where, as conceded in this case for purposes of this appeal, that the government is allowed to deprive an individual of his or her property before a hearing, there must be a

"prompt" post-deprivation hearing thereafter. *FDIC v. Mallen*, 486 U.S. 230, 246 (1988). "In short, 'within the limits of practicability,' a State must afford all individuals a meaningful opportunity to be heard if it is to fulfill the promise of the Due Process Clause." *Boddie v. Connecticut*, 401 U.S. 371 (1971) (quoting *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 313 (1950)); see also *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965) ("A fundamental requirement of due process is the opportunity to be heard," meaning "an opportunity which must be granted at a meaningful time and a meaningful manner.")

The United States Supreme Court has held that "[a]t some point, a delay in [a] post-[deprivation] hearing would become a constitutional violation." *Loudermill*, 470 U.S. at 547. This Court has held, "While there is no specific time from within which a hearing must be held to qualify as 'prompt,' lack of speedy resolution to proceedings may result in a denial of due process." *Baird v. Bd. of Educ. For Warren Cmty. Unit Sch. Dist. No. 205*, 389 F.3d 685, 692 (7th Cir. 2004). The word " 'prompt' means exactly what one would think. A delay of even a few days has sometimes been enough for a constitutional violation." *D'Acuisito v. Washington*, 640 F.Supp. 594, 614 (N.D. Ill. 1986) (contrasting *Mackey v. Montrym*, 443 U.S. 1 (1979), where the Court held an immediate right to request a hearing was prompt, with *Barry v. Barchi*, 443 U.S. 55 (1979), where a 15-day horse trainer's license suspension was not). A "prompt" post-deprivation hearing must "be concluded *without appreciable delay*." *Barry*, 443 U.S. at 66 (emphasis added); see also *Stypmann v. City & Cnty. Of San Francisco*, 557 F.2d 1338 (9th Cir. 1977) (five-day

delay between the towing and the post-deprivation hearing unconstitutional).

In this case, the Plaintiff suffered over a one-year-and-fourth-month delay from the time of the revocation on February 3, 2011 to when his FOID card was reinstated on June 5, 2012. Defendant Coffman cannot offer any legitimate reason for this extraordinary delay in giving the Plaintiff a "prompt" post-deprivation hearing, despite the Plaintiff's statutory right to a post-deprivation hearing. Section 10 of the FOID Card Act provides that an "aggrieved party may appeal to the Director of the Illinois State Police for a hearing upon such denial, revocation, or seizure . . ." 430 ILCS 65/10(a). Identifying what process is due requires consideration of three distinct factors. *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976). "First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Id.* Additionally, while "the concept of due process generally demands fewer procedural safeguards at informal administrative proceedings than during formal judicial hearings[,]" "there is a procedural floor below which even informal proceedings cannot go." *Cooper v. Salazar*, 196 F.3d 809, 814 (7th Cir. 1999). Here, the utter lack of any meaningful process after the Plaintiff's property deprivation falls well below this procedural floor.

As an initial matter, before addressing the *Mathews* factors, the Plaintiff

must address the district court's constrained view of the delay attributable to Coffman for the purposes of Section 1983 liability. The Plaintiff makes this point because the lower court first erred in considering only a portion of the total post-deprivation period, then the court compounded this error by focusing only on the amount of time the Plaintiff was delayed rather than the inadequacies of the procedures themselves, which led directly to the delay.

First, as to the issue of timing, the Plaintiff suffered over a one-year-and-fourth-month delay from the time of the revocation on February 3, 2011, to when his FOID card was reinstated on June 5, 2012. Rather than address this full delay, the district court instead ruled that Coffman was only responsible for a six-month delay between the Plaintiff's "initial request for reinstatement and Coffman's leaving the Bureau – or, if Coffman were held responsible through June 2012, the ten-month delay between Rhein's initial request and his FOID card's reinstatement. . ." (Dkt. 100, p. 15). The district court reasoned that Coffman cannot be held responsible for his actions (or inactions) after he left as head of his bureau in February of 2012 because he then was no longer "personally involved in the alleged constitutional violation." (Dkt. 100, p. 15) (quoting *Palmer v. Marion Cnty.*, 327 F.3d 588, 594 (7th Cir. 2003); *Hildebrandt v. Ill. Dep't of Natural Res.*, 347 F.3d 1014, 1039 (7th Cir. 2003); *Vance v. Peters*, 97 F.3d 987, 991 (7th Cir. 1996)). This ruling was in error.

Coffman transferred out of the Bureau of Firearm Services to ISP's Division of Operations, at which point he had no more involvement with Rhein's request for

a hearing or reinstatement (Dkt. 75, at ¶¶ 42-43), but this fact should not absolve him of liability for the delay caused between his transfer in February of 2012, and the Plaintiff getting his FOID card reinstated in June of 2012.  As this Court has explained, "There is no rule demanding that every case have only one proximate cause. To the contrary, multiple proximate causes are often present and an actor's tortious conduct need not be close in space or time to the plaintiff's harm to be a proximate cause." *Whitlock v. Brueggemann*,  682 F.3d 567, 583 (7th Cir. 2012). There is no doubt that Coffman was at least one of the proximate causes of the delay (indeed, the primary one), and thus he is liable for the delay that occurred after he transferred out of his unit.

The district court reasoned that Coffman lacked the requisite Section 1983 "personal involvement" after he left his unit (Dkt. 100, p. 15), but this reasoning misses the mark.  This Court has held state actors are liable for Section 1983 violations where they "*caused or participated* in a constitutional deprivation." *Vance*, 97 F.3d at 991 (emphasis added).  Moreover, "Omissions as well as actions may violate civil rights," and damages are recoverable for both "misfeasance and nonfeasance." *Yang v. City of Chicago*, 37 F.3d 282, 285 (7th Cir. 1994).  Coffman, at a minimum, committed "nonfeasance" but also "misfeasance," he definitely was at least a cause of the Plaintiff's deprivation, and he certainly "participated in a constitutional violation," and thus he had more than enough "personal involvement" so as to give rise to Section 1983 liability for the four-month period after he transferred units.  Certainly, Coffman took no steps prior to transferring to assure

the Plaintiff would get a prompt hearing after he left the unit, and his prior delays certainly caused or contributed to the four-month delay thereafter. The district court's reasoning begs the question. If Coffman is not responsible for this four-month period, then who is? Was it necessary that the Plaintiff file suit against Coffman's replacement, even though Coffman was the person who set the chain-of-events into motion by revoking the Plaintiff's license without a hearing, failed to ensure a "prompt" hearing, imposed arbitrary and onerous conditions on the Plaintiff, then ignored the Plaintiff's evidence once it was submitted?

Moreover, there is no reason to exclude the period from when the Plaintiff's FOID card was revoked (February 3, 2011) to the Plaintiff's "initial request for reinstatement," which was sent by the Plaintiff's attorney on August 1, 2011, and stamped "received" in Coffman's unit on August 8, 2011 (Dkt. 100, pp. 6, 15) (Dkt. 77, ¶ 81; Dkt. 68-3, 79). The district court gave no explanation for excluding this time (Dkt. 100, p. 15). This, too, was error. After Coffman summarily revoked the Plaintiff's FOID card, he imposed conditions on the Plaintiff, as conditions-precedent to even requesting a hearing, that are (a) nowhere to be found in the statute, and (b) arbitrary and unduly onerous.

First, the exclusion of the time period between the initial revocation and the formal request for a hearing should not be excluded from due process consideration because this delay was caused by Coffman's conditions-precedent to obtaining a hearing, which are found nowhere in the FOID Cart Act statute. Section 10 of the FOID Card Act provides that an "aggrieved party may appeal to the Director of the

Illinois State Police for a hearing upon such denial, revocation, or seizure . . ." 430 ILCS 65/10(a). The statute requires no conditions-precedent to requesting a hearing or reinstatement. Instead, the conditions-precedent were conditions that were placed upon the Plaintiff by Coffman, and Coffman alone. Moreover, these are onerous conditions, and, in the case of the psychological letter, Coffman knew it would have been a condition that may have been difficult, or perhaps impossible to fulfill, not based on one's actual mental frailties, but based on a mental health professional's reluctance to expose himself or herself to liability. Then, after the Plaintiff actually found a psychologist willing to write such a report, Coffman then simply ignored the letter, without any justifiable reason. This Court has held governmental officials violate the due process clause by engaging in "inexplicable bureaucratic delays" that deny post-deprivation relief. *Tavarez v. O'Malley*, 826 F.2d 671, 674 (7th Cir. 1987); see also *D'Acuito*, 640 F.Supp. at 617 (a state actor may not "impose[ ] unnecessary burdens on the person facing a deprivation." (citing *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965); *Patkus v. Sangamon-Cass Consortium*, 769 F.2d 1251, 1265 (7th Cir. 1985); and *Schultz v. Baumgart*, 738 F.2d 231, 235 (7th Cir. 1984)).

Second, the exclusion of the time period between the initial revocation and the formal request for a hearing should not be excluded from due process consideration because it was Coffman's burden to provide a "prompt" post-deprivation hearing. The Supreme Court puts the burden on the governmental official to provide a "prompt" post-deprivation hearing. "A deprivation may be the

17

consequence of a mistake or negligent *and the State may violate the Constitution by failing to provide an appropriate procedural response.*"  *Daniels v. Williams*, 474 U.S. 327, 339 (1986) (Stevens, J., concurring) (emphasis added); see also *D'Acuisito*, 640 F.Supp. at 606 (N.D. Ill. 1986) ("The Fourteenth Amendment imposes *on the state* the duty to provide adequate due process.") (emphasis added) (citing *Daniels*, 474 U.S. at 339 (Stevens, J., concurring)); see also *Patterson v. Armstrong County Children and Youth Services*, 141 F.Supp.2d 512, 531 (W.D. Pa. 2001) ("the state is obligated to provide a prompt, post-deprivation hearing in a meaningful time and meaningful manner.").  This must be a "state initiate[d]" hearing.  *Id.*  An "essential" component of due process is that an individual deprived of his property must be given " 'some kind of hearing,' *Loudermill*, 470 U.S. at [542], 105 S.Ct. at 1493.  The chance to be heard, to present one's own side of the story, is fundamental requirement of any fair procedural system."  *D'Acusito*, 640 F.Supp. at 612 (citing *Loudermill*, 470 U.S. at 542).  The district court cited to no legal authority, and none can be found, that would allow a governmental official to put the burden on the person whose property has been summarily revoked by the government to satisfy certain conditions before he is even allowed to request a hearing, even though it is required that the government provide "some kind of hearing" post-deprivation.  *Loudermill*, 470 U.S. at 542.[5]

    Moreover, the district court erred in focusing solely on the timing issue, and

---

[5] The Plaintiff is aware that the Constitution does not require a "full evidentiary hearing," and the hearing does not need to be "elaborate."  *Loudermill*, 470 U.S. at 545.  However, "something less" than a full hearing is required (*Id.*), thus stating the obvious that providing no hearing at all, and ignoring evidence that Coffman himself requested be submitted to him cannot satisfy due process.

ignoring Coffman's actions (and inactions) that directly led to this delay, which is a related, but distinct, due process concern. Due process, after all, is concerned with both the "how *and* when" of the process that is given. *Barry*, 443 U.S. at 66 (emphasis added). The Supreme Court has never looked only to the "when," as did the district court, but has always looked to the "how" for guidance as well.

For example, in *Barry*, the Supreme Court ruled that the state, upon probable cause to believe a horse trainer had drugged a horse, could summarily suspend the horse trainer's license, without a hearing, but held that the state's 15-day delay in providing a post-deprivation hearing violated due process. *Barry*, 443 U.S. at 66. The Court found that, once the horse trainer's license was suspended, his interest in a "speedy resolution" of the drugging issue because "paramount" and that it found little or no interest "in an appreciable delay in going forward with a full hearing." *Id.*

By contrast, in *Loudermill*, the Court upheld a post-deprivation adjudication that lasted nine months. In *Loudermill*, the plaintiff, a public-sector security guard, was summarily discharged by letter dated November 3, 1980 after it was revealed that the plaintiff may have lied on his job application about his criminal background. *Id.* at 535. Ten days later, the Board of Education approved the dismissal, which was appealed two days later. A hearing was held on January 29, 1981, and the referee recommended reinstatement. *Id.* The full Civil Service Commission then reviewed this decision, and announced it would uphold the dismissal. *Id.* Proposed findings of fact and conclusions of law followed on August

10, and the plaintiff's attorneys were advised of the decision on August 21. Although the Commission's decisions were subject to judicial review in state courts, the plaintiff instead brought suit in federal court. *Id.* The Court found this nine-month delay was not "unconstitutionally lengthy *per se*," because it "stemmed in part from the thoroughness of the procedures." *Id.* at 547. In other words, the plaintiff failed to present any evidence that "his wait was unreasonably prolonged other than the fact that it took nine months." *Id.*

The court in *D'Acquisto* explained that *Loudermill* was "not decided on the amount of time alone," and did not "set out a bright line rule that nine months will always fall safely within due process," but instead the decision rested on the fact the post-deprivation hearings in *Loudermill* were not "unreasonably prolonged." *D'Acquisto*, 640 F.Supp. at 618 (emphasis in original) (quoting *Loudermill*, 470 U.S. at 547). Thus, "It follows that a delay of less than nine months could infringe due process if there was no reason for the delay and, conversely, that a longer delay than nine months could in some circumstances be constitutionally justifiable." *Id.* at 618. In *D'Acqusito*, the court found that an average delay of four to five months for a post-deprivation hearing "could be too long if there was no procedural justification for the delay." *Id.* Moreover, this Court in *Tavarez* found that city and county officials who shut down the plaintiff's grocery store after a carbon monoxide emission was discovered, then did nothing for about a month to either re-open the grocery store or provide a hearing, violated the plaintiffs' due process rights duby engaging in "inexplicable bureaucratic delays." *Tavarez*, 826 F.2d at 674.

Thus, the district court erred in inexplicably examining only a portion of the delay caused by Coffman, and in completely ignoring Coffman's procedures, and focusing instead only on the matter of timing. However, the district court also erred in completely failing to address the three *Mathews* factors in the context of the post-deprivation remedy, even though the court acknowledged that the Supreme Court requires the application of the *Mathews* three-part test in all due process cases (Dkt. 100, p. 8). Rather than rule whether Coffman violated the Plaintiff's due process rights, the court instead decided the issue solely on qualified immunity grounds, an error that will be addressed more fully below.

### First *Mathews* Factor -- The Private Interest at Stake

To begin, the first *Mathews* factor favors the Plaintiff because he has a strong private interest in his FOID card and the concomitant right to the use of his firearms for self-defense and other recreational uses. The right of the Plaintiff to use his firearms for self-defense is not only a strong interest, but a fundamental right. The Second Amendment generally guarantees an individual the right to possess a weapon for protection in case of confrontation. *District of Columbia v. Heller*, 554 U.S. 570, 630 (2008). In *McDonald v. City of Chicago*, 561 U.S. 742 (2010), the United States Supreme Court held that the right to bear arms is "fundamental" to the American "scheme of ordered liberty" and "deeply rooted in this Nation's history and tradition." *Id.* at 768. The Court identified "[s]elf-defense as a basic right" and, moreover, has held "individual self-defense . . . 'the *central component*' of the Second Amendment right." *McDonald*, 130 S.Ct. at 3036 (citing

*Heller*, 554 U.S. at 599).  This Court has interpreted *Heller* and *McDonald* as establishing such a fundamental and broad Second Amendment right that it has ruled this right to carry a firearm (with few exceptions) includes the right to carry one for self-protection outside the confines of the home.  *Moore v. Madigan*, 702 F.3d 933, 936 (7th Cir. 2012).  This Court held that "the right of armed self-preservation" is a fundamental natural right "on par with seeking redress in the course of petitioning the government." *Id.* at 937. Additionally, under the Illinois Constitution, "[s]ubject only to the police power, the right of the individual citizen to keep and bear arms shall not be infringed." Ill. Const. Art. 1 § 22. Further, the Second Circuit has addressed this particular issue, and in *Kuck v. Danaher*, 600 F.3d 159 (2d Cir. 2010) held that when dealing with the deprivation of a firearms permit "the private interest at stake remains significant." *Id.* at 165.  Here, the Plaintiff's private interest in his FOID card is, "as a general rule," more than indeed "strong," to quote the court below (Dkt. 100, p. 9).  The Plaintiff agrees, and notes that the interest is even stronger now than it was at the time *Kuck* was decided because *Kuck*, which did not rely on any federal right to bear arms in deciding the private interest at stake, was decided before *McDonald*, and before this Court's decision in *Moore*, which both clarified and strengthened the federal right to bear arms.

The district court in this case did not address this *Mathews* factor as it related to the Plaintiff's post-deprivation claim, but did imply, in the context of the Plaintiff's pre-deprivation claim, that this right is diminished because of the state's

ability to prohibit the possession of firearms by the "mentally ill." (Dkt. 100, p. 9).

While conceding the Plaintiff may not have "technically qualified as mentally ill,"

(*Id.*), the Plaintiff's statements to Representative DeLuca and his employee "could

have prompted the reasonable conclusion that Rhein was mentally imbalanced . . .

" *Id.* The court erred in implying the Plaintiff had a diminished Second Amendment

interest based on the aforementioned statements. First, "the state's ability to

regulate firearms does not extinguish the liberty interest at stake or eliminate the

need to afford due process." *Kuck*, 600 F.3d at 165. Second, the district court's

reasoning is circular. The court reasoned that, because it can be reasonably

concluded the Plaintiff was "mentally imbalanced" at the time of his revocation,

then his interest in owning firearms is diminished. However, unless there is some

sort of hearing to challenge the assertion that he is "mentally imbalanced," then it

is fundamentally unfair to simply conclude he is "mentally imbalanced," based

solely on the statements he made to his political representative and his employee,

especially in light of a written report from a psychiatrist, who comes to the opposite

conclusion.

Moreover, "The possible length of wrongful deprivation is an important factor

in assessing the impact of official action on the private interests." *Mathews*, 424

U.S. at 341. In other words, "depravations may not be indefinite, particularly

where the delay cannot be attributed to any clear state interest or the risk of

erroneous deprivation is significant." *Kuck* at 164. The Plaintiff has a strong

interest in obtaining timely relief, not only to challenge the stigmatizing conclusion

that he is mentally ill, but also to get back his gun license and weapons, which he used for self-defense and recreation.  Also, the fact that the Government is taking away the Plaintiff's Constitutional right to own a weapon (the license), and his own property (his guns) is a factor that weighs in favor of the Plaintiff since the Plaintiff is not claiming, as in *Mathews* and many other due process cases, that he is denied a benefit doled out by the Government.  *Kraebel v. New York City Dep't of Housing Preservation & Dev.*, 959 F.2d 395, 405 (2d Cir. 1992) (the private interest at stake is particularly strong where the plaintiff is "not a supplicant seeking payments through a generous bureaucracy; she is a deprived property owner seeking reimbursement" for her loss of property).  This first factor weighs in the Plaintiff's favor.

**The Second *Mathews* Factor – The Risk of Erroneous Deprivation of Property**

The second *Mathews* factor also weighs in the Plaintiff's favor because there was a high risk of erroneous deprivation of the Plaintiff's property since Defendant Coffman ignored *all* of the Plaintiff's request for post-revocation relief, even when the Plaintiff complied with all of Defendant Coffman's requirements for a hearing, resulting in significant and unnecessary delay.  An unjustifiable delay in providing a post-deprivation hearing is a factor that weighs in favor of the person deprived of the property interest.  "The primary purpose of a post-revocation hearing within a reasonable time is to account for the second '*Mathews*' factor, the risk of erroneous deprivation."  *B & B Target Ctr., Inc. v. Figueroa-Sancha*, 871 F.Supp.2d 71, 79 (D.C. Puerto Rico 2012).  "The focus must be on the 'ready availability of [a] prompt

post-deprivation review[.]" *Id.* (quoting *Gonzalez-Droz v. Gonzalez-Colon*, 660 F.3d 1, 13 (1st Cir. 2011)). In fact, providing the Plaintiff the process he was due would considerably reduce the risk of erroneous deprivations, particularly when the revocations are based on what Coffman perceived to be a clear and present danger. Considering a report by a trained psychologist that addressed the Plaintiff's suitability to possess firearms would reduce the chances that revokees continue to be unjustly deprived of their FOID cards and weapons. Here, Defendant Coffman failed to even review the very items that he requested from Plaintiff, including the psychological report.

In further considering the second *Mathews* factor, the Second Circuit's decision in *Spinelli* is instructive. In *Spinelli*, the Second Circuit reversed a grant of summary judgment, and directed entry of summary judgment in favor of the plaintiff, who was denied post-deprivation due process when she was not provided with a prompt hearing following the revocation of her gun dealer license and seizure of her weapons. There, the plaintiff received a letter notifying her of the revocation based on "a failure to provide adequate security" for her gun shop. *Id.* at 164. The letter provided the name of a sergeant assigned to her case and provided his phone number, but did not notify her of her opportunity for a hearing under the law. *Id.* at 164-65. The plaintiff hired an attorney and, instead of formally requesting a hearing, the attorney, contacted members of the licensing division through correspondence requesting the immediate return of plaintiff's property. *Id.* at 165. The chief of the licensing division informed plaintiff that suspending a dealer's

license and retaining their property throughout the duration of their investigation is "the norm." *Id.* Eventually, 58 days later, plaintiff was able to reinstate her gun license and retrieve her property. *Id.* at 172. In holding that the plaintiff's right to post-deprivation process was violated, the Second Circuit held that the city's "blanket policy of providing a hearing after the investigation is completed cannot be squared with due process," and entered summary judgment in favor of the plaintiff. *Id.* at 173.

Similarly, in the instant case, Coffman set up a system whereby the Plaintiff was forced to conduct his own investigation – on himself – and then submit the results of his investigation to Coffman, and only then would Coffman relay that information to the legal department so that he could be considered for a hearing. This is exactly the sort of procedure that the *Spinelli* Court found "cannot be squared with due process." However, in this case Coffman's actions were much worse because, not only was the Plaintiff's deprivation seven-times longer than in *Spinelli*, in this case after the Plaintiff submitted the requested evidence, Coffman then just ignored the Plaintiff, and his attorney. The second *Mathews* factor also weighs in favor of the Plaintiff.

**The Third *Mathews* Factor – The Government's Interest**

Finally, the third *Mathews* factor addresses "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews*, 424 U.S. at 335. Any claim that the Firearm Services Bureau had to act quickly in response

to the perceived threats in order to secure the public interest is "irrelevant" for the determination of what post-deprivation process is due. *Spinelli*, at 579 F.3d at 174. The relevant inquiry is whether the Defendant Coffman has a "legitimate interest in not providing [the Plaintiff] with meaningful post-deprivation process." *Id.* Further, a post-revocation hearing would entail minimal fiscal and administrative burdens, and any additional burdens would be outweighed by the value of avoiding unnecessary litigation. Revokees who wait for months or years, as the Plaintiff did, would not have to resort to litigation if a hearing (as required by the FOID Card Act) was promptly provided to them. Nor does such a delay serve any important "underlying governmental interest." *Mallen*, 486 U.S. at 242. In fact, the contrary is true. Allowing the Plaintiff to present his side of the story and evidence of his "mental condition" prepared by a licensed psychologist would address the underlying governmental interest in keeping firearms out of the hands of dangerous individuals. See also *Barry*, 443 U.S. at 66 (After a licensee's revocation, "a speedy resolution of the controversy becomes paramount" and "[w]e discern little or no state interest, and the State has suggested none, in an appreciable delay in going forward with a full hearing. On the contrary, it would seem as much in the State's interest as [the licensee's] to have an early and reliable determination" of the issue.") Therefore, the third *Mathews* factor also weighs in favor of the Plaintiff.

## II. The district court erred in granting Defendant Coffman qualified immunity.

The district court erred in granting Defendant Coffman qualified immunity. Once a defendant asserts a qualified-immunity defense, the plaintiff has the burden

27

to establish that the defendant's action violated a clearly established right. *Estate of Escobedo v. Bender,* 600 F.3d 770, 779 (7th Cir.2010). A constitutional right is "clearly established" for qualified immunity purposes where "the contours of the right are sufficiently clear that a reasonable official would understand that what he is doing wrong violates that right." *Abbott v. Sangamon County*, 705 F.3d 706, 725 (7th Cir. 2013).

The district court never addressed the *Mathews* factors, refused to determine whether Coffman's actions afforded the Plaintiff post-deprivation due process, and instead exercised its discretion to determine whether Coffman's actions violated clearly established law (Dkt. 100, p. 14) (citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2009); and *Mordi v. Zeigler*, 770 F.3d 1161, 1165 (7th Cir. 2014)). Additionally, relying on this Court's decisions in *Benson v. Allphin*, 786 F.2d 268 (7th Cir. 1986), superseded by statute on other grounds as stated in *Laborers' Pension Fund v. A & C Envtl., Inc.*, 301 F.3d 768, 778 (7th Cir. 2002), as well as other cases from this Circuit and others, the district court ruled that qualified immunity was additionally appropriate because the resolution of the matter involved the "balancing of interests," so "the facts of the existing caselaw must closely correspond to the contested action." (Dkt. 100, p. 16) (quoting *Benson*, 786 F.2d at 276).

Initially, it should be noted, although the Supreme Court no longer required lower courts to decide the constitutional issue before deciding the qualified immunity issue, the Court nevertheless encouraged lower courts to conduct the two-step analysis, finding the practice "beneficial," because it takes scant resources to

squarely address the constitutional issue (as opposed to determining the constitutional issue is unclear), and the practice promotes the "development of constitutional precedent." *Pearson*, 555 U.S. at 236. This is important because in this case the district court punted the constitutional issue, based on this principle, combined with the supposed principle, per *Benson*, that constitutional issues involving balancing tests usually will result in the granting of qualified immunity. The result of the district court's analysis was a complete abdication of its duty to carefully address the three *Mathews* factors, and hence the constitutional question before the court.

The court decided to ignore the *Mathews* factors and instead focus solely on the fact that there is no clearly established timeline for providing post-deprivation hearings (Dkt. 100, pp. 15-18). The Plaintiff agrees with the district court that there is no bright-line rule as to what constitutes a "prompt" post-deprivation hearing. The Supreme Court in *Barry* held that a 15-day delay was constitutionally deficient, and this Court in *Tavarez* found the same involving a one-month delay, while the Court in *Loudermill* held that a nine-month delay was not *per se* impermissible. However, focusing only on the time frame misses the point. The district court only addressed "when" the delay occurred, not "how" it came about. *Barry*, 443 U.S. at 66. As the court in *D'Acquisto*, explained, *Loudermill* was "not decided on the amount of time alone," and did not "set out a bright line rule that nine months will always fall safely within due process," but instead the decision rested on the fact the post-deprivation hearings in *Loudermill* were not

"*unreasonably prolonged*." *D'Acquisto*, 640 F.Supp. at 618 (emphasis in original)

(quoting *Loudermill*, 470 U.S. at 547). In this same vein, the district court failed to

address whether Coffman engaged in "inexplicable bureaucratic delays" in affording

the Plaintiff post-deprivation relief or whether Coffman "imposed unnecessary

burdens on" the Plaintiff. *Tavarez*, 826 F.2d at 674.

The district court's combination of skipping right to the "clearly established"

prong, then failing to decide the due process issue merely because courts have not

established a bright-line rule establishing a specific time when a post-deprivation

hearing must be conducted, sets a dangerous precedent. Even though courts do not

decide whether a post-deprivation hearing was "prompt" and "meaningful" based

solely on the amount of time elapsed, the district court made such a finding. Under

the district court's reasoning, no person could ever bring a Section 1983 lawsuit

against a governmental actor for not conducting post-deprivation hearing in a

timely manner because, according to the court, there is no "clearly established law"

that establishes a set cut-off point. In fact, under the district court's reasoning,

Defendant Coffman's successor could do the very same actions, again, to the

Plaintiff, even more onerously and arbitrarily, and for longer, and there would be

nothing that the Plaintiff could do to obtain damages for such actions, since the law

is supposedly "not clearly established" on the post-deprivation process that is due,

and the court's decision did not decide the issue, either.

The district court's punting of constitutional issue also was linked to a

misinterpretation of this Court's decision in *Benson*. While it is true that *Benson*

held "it would appear" that "whenever a balancing of interests is required, the facts of the existing caselaw must closely correspond to the contested action before the defendant official is subject to liability under *Harlow*," this Court also went on to explain, "There may, of course, be a situation where the defendant's actions are so egregious that the result of the balancing test will be a foregone conclusion." *Benson*, 786 F.2d at 276 n. 18.  This case presents such egregious conduct. Moreover, both the Ninth and Tenth Circuits have held *Benson* should not be read too broadly when the constitutional issue requires a "particularized balancing" because this would "effectively eviscerate" a litigant's ability to bring forth Section 1983 challenges.  *Roth v. Veteran's Admin. of United States*, 856 F.2d 1401,1408 (9th Cir. 1988); see also *Melton v. City of Okla. City*, 879 F.2d 706, 729 (10th Cir. 1989) ("We understand the concerns which prompted the Ninth Circuit's determination not to give *Benson* "a broader reading."); see also *United States v. Lanier*, 520 U.S. 259, 271 (1997) (to require something "clearer" than "clearly established" would, then, call for something beyond 'fair warning' "); *Hope v. Pelzer*, 536 U.S. 730, (2002) ("in *Lanier*, we expressly rejected a requirement that previous cases be "fundamentally similar," noting "officials can still be on notice that their conduct violates established law even in novel factual circumstances.")

In this case, the Plaintiff has been unable to find any case in this Circuit that dealt directly with a due process case involving the denial of a gun license. However, this is only the subject matter of the instant lawsuit; there is no requirement that the Plaintiff point to another closely analogous gun-licensing case

to establish "fair notice" to a "reasonable officer" that his conduct would violate the due process clause, especially when Coffman's actions are so obviously egregious.  In the wake of *Benson*, in decisions issued both before and after *Lanier* and *Hope*, this Court has never held a plaintiff must point to specific case law regarding a closely analogous subject matter; instead a plaintiff must point to "closely analogous case law" regarding the constitutional right at issue.  See, e.g., *Connor v. Reinhard*, 847 F.2d 384, 393 (7th Cir. 1988) (In a first-amendment case involving the employment of a balancing test, this Court held, "Given the wealth of closely analogous case law concerning the first amendment right of public employees to speak on matters of public interest, the defendants should have been on notice that their conduct was probably unlawful."); see also *Baird v. Bd. of Educ. For Warrant Cnty. Unit Sch. Dist. No. 205*, 389 F.3d 685 (7th Cir. 2004) (in a due process case, which involved the balancing of the three *Mathews* factors, the officials were not entitled to qualified immunity because it would have been clear to "a reasonable officer that his conduct was unlawful in the situation he confronted" because other cases "defined the contours of what process was due to a public employee who is terminated."); see also *Armstrong v. Daily*, 786 F.3d 529 (7th Cir. 2015) (in qualified immunity cases, "the focus is on [the official's] conduct, not on whether that conduct gave rise to a tort in a particular case.")

Thus, the Plaintiff will first address the qualified immunity issue in the general context of the clearly established case law regarding one's right to a "prompt" and "meaningful" post-deprivation hearing, without regard to whether

those cases involve gun licensing. Alternatively, the Plaintiff will also address the out-of-circuit case law regarding gun licensing. The Plaintiff need not cite to any further cases than *Barry*, *Loudermill*, and *Tavarez* to demonstrate that Coffman violated the Plaintiff's "clearly established" due process rights. See, e.g., *Baird*, 389 F.3d 696 (pointing to Supreme Court case law, including *Loudermill*, rather than case-specific cases in determined that the officers violated the "clearly established" due process rights of the plaintiff). In *Barry* (decided in 1979), the Supreme Court held that, in the absence of a pre-deprivation hearing, due process requires a post-deprivation that is "prompt," meaning one "concluded without appreciable delay." *Barry*, 443 U.S. at 66. In *Barry*, also a licensing case, the Court held that a 15-day delay was not "prompt," and thus was impermissible. In *Loudermill* (decided in 1985) by contrast, the Court upheld a nine-month delay, finding this delay was not "unconstitutionally lengthy *per se*" because "it stemmed in part from the thoroughness of the procedures." *Loudermill*, 470 U.S. at 547. The Court rested its decision on the fact that the plaintiff failed to provide any evidence that "his wait was *unreasonably prolonged* other than the fact that it took nine months." *Id* (emphasis added). Thus, it would have been clear to any reasonable officer in 2011 that the Court will not care so much about the pure length of time it takes to conclude a pre-deprivation hearing, but rather with the "thoroughness of the procedures," and whether the official "unreasonably prolonged" the post-deprivation review. Furthermore, this would have been even more apparent after this Court's decision in *Tavarez* (decided in 1987), when this Court held a one-month delay in

33

obtaining post-deprivation review violated due process where the delay was the result of the governmental official's "inexplicable bureaucratic delays." *Tavarez*, 826 F.2d at 674. Defendant Coffman "unreasonably prolonged" post-deprivation due process review when he imposed conditions-precedent to a hearing that are found nowhere in the statute, he ignored the submitted evidence that he requested, and then he continued to do absolutely nothing to ensure the Plaintiff receive a "prompt" post-deprivation hearing. In due process cases, like other civil rights cases, "[r]educed to its essential elements, if the public official's mistake as to what the law requires is reasonable, the official is entitled to the immunity defense." *Baird*, 389 F.3d at 698. Determining whether a "mistake" is reasonable "does not necessitate comparison to a precedent that squares in every detail with the present case." *Id.* Simply put, there is no way Coffman can credibly argue his actions were a "reasonable mistake" as to what the law required since it was clearly established before 2011 that post-deprivation hearings must be prompt and meaningful, not unreasonably prolonged, and not be subjected to inexplicable bureaucratic delays.

Alternatively, to the extent that *Benson* can be read to demand the Plaintiff point to factually similar cases, *i.e.*, gun licensing cases, the law in this regard, too, was clearly established. To do this, the Plaintiff must go outside of this Circuit, but this should not be problematic. There is no requirement that there be a case with a "similar fact pattern" to demonstrate reasonable notice to a law enforcement officer that his or her actions would violate the constitution. For qualified immunity purposes, "The 'clearly established law' element of qualified immunity is flexible

enough to embrace clearly established law of other circuits." *Patterson*, 141

F.Supp.2d at 540 (citing to *Turiano v. Schnarrs*, 904 F.Supp. 400, 414 n. 15 (M.D.

Pa. 1995) ("Much of the directly applicable case law emanates from outside this

circuit, but that is not important.") The Plaintiff is not aware of any direct holding

from this Court that says the same, but it is implied in its qualified immunity

analysis, which has taken into account case law from other circuits in rejecting

qualified immunity defenses. See, e.g., *Abbott*, 705 F.3d at 731-32; see also

*Narducci v. Moore*, 572 F.3d 313, 323 (7th Cir. 2009).

In *Spinelli*, (decided in 2009), the plaintiff (a gun shop owner), sued, *inter*

*alia*, a New York City Police sergeant, for revoking her gun-shop permit and then

not giving her a prompt, meaningful hearing. *Id.* at 163. Within only a month of

the greatest terrorist attack in United States history, in New York City, the City

responded by taking emergency measures to ensure gun dealers were complying

with all previously issued gun-licensing requirements designed to secure weapons

found in gun shops. *Id.* at 164. Upon inspection, the police found the security at

the gun shop was "grossly inadequate," which included an unwatched counter area,

a large hole in the backyard fence, and two unlocked safes. *Id.* The plaintiff

received a letter notifying her of the revocation based on "a failure to provide

adequate security" for her gun shop. *Id.* at 164. The letter provided the name of a

sergeant assigned to her case and provided his phone number, but did not notify her

of her opportunity for a hearing under the law. *Id.* at 164-65. The plaintiff hired an

attorney and, instead of formally requesting a hearing, the attorney contacted

members of the licensing division through correspondence requesting the immediate return of plaintiff's property. *Id.* at 165. The chief of the licensing division informed plaintiff that suspending a dealer's license and retaining their property throughout the duration of their investigation is "the norm." *Id.* Eventually, 58 days later, plaintiff was able to reinstate her gun license and retrieve her property. *Id.* at 172. In holding that the plaintiff's right to post-deprivation process was violated, the Second Circuit noted that the fact that plaintiff voluntarily opted out of pursuing a formal hearing through the administrative process and instead chose to negotiate with the city through her attorney, did not bar her from pressing a claim, because the administrative process was not available to her pending the city's investigation. *Id.* at 173. There, the court held that the city's "blanket policy of providing a hearing after the investigation is completed cannot be squared with due process," and entered summary judgment in favor of the plaintiff. *Id.* at 173.

In this case, similarly, the subject matter of the due process is the denial of a gun license, and then the taking away of the Plaintiff's guns. Moreover, in this case the governmental officials notified the plaintiff, via letter, how to start the process of obtaining a hearing, but a hearing was not immediately provided during the investigation. Moreover, in this case, frustrated with the lack of ability to challenge the license revocation, the plaintiff hired an attorney to successfully resolve the matter. Of course, in this case Coffman's actions were much more egregious because he imposed arbitrary and onerous conditions-precedent to even requesting a hearing, he then ignored evidence submitted to him, and then proceeded to

unnecessarily delay the proceedings until the delay reached almost a year and a half.  To be sure, as the district court pointed out (Dkt. 100, p. 18), "*Spinelli* is a business license case, not a gun ownership case," and thus the license revocation did not directly affect the Plaintiff's employment.  However, the delay in this case was seven times longer than in *Spinelli* and Coffman's bureaucratic bungling much more egregious, thus offsetting this factual distinction.  Moreover, in a case decided shortly after *Spinelli*, in 2010, the Second District applied *Spinelli* to a gun licensing case that did *not* involve the loss of employment, and in that case the court found a due process violation occurred due to the "months-long delay" in "indefinitely denying permit applications" without affording those denied "a post-deprivation opportunity to contest an adverse finding by the [gun licensing] department."  *Kuck*, 600 F.3d at 167.  Defendant Coffman is not entitled to qualified immunity.

## CONCLUSION

For the foregoing reasons, Plaintiff-appellant David Rhein respectfully requests that this Court reverse the district court's decision granting Defendant-Appellee Coffman's motion for summary judgment and denying his, and instead enter summary judgment in favor of Mr. Rhein, and against Mr. Coffman.


Respectfully Submitted,

s/Richard Dvorak
_____
Richard Dvorak, attorney for
Plaintiff-Appellant David Rhein


Richard Dvorak

Adrian Bleifuss Prados
Dvorak Law Offices, LLC
6262 Kingery Highway, Suite 305
Willowbrook, IL 60527
Ph: (312) 593-7146
Fax: (312) 873-3869

## CERTIFICATE OF COMPLIANCE WITH F.R.A.P. 32(A)(7)

The undersigned, counsel of record for the Plaintiffs-Appellants, furnishes the following in compliance with F.R.A.P. Rule 32(a)(7):

I hereby certify that this brief conforms to the rules contained in F.R.A.P. 32(a)(7) for a brief produced with a proportionately spaced font. The length of this brief is 11,488 words.

Respectfully Submitted,

s/Richard Dvorak

_____
Richard Dvorak, attorney for
Plaintiff-Appellant David Rhein

Richard Dvorak
Dvorak Law Offices, LLC
6262 Kingery Highway, Suite 305
Willowbrook, IL 60527
Ph: (312) 593-7146
Fax: (312) 873-3869

## CIRCUIT RULE 31(e)(1) CERTIFICATION

The undersigned hereby certifies that I have filed electronically, on December 14, 2015, pursuant to Circuit Rule 31 (e)(1), versions of the brief and all of the appendix items that are available in non-scanned PDF format.

Respectfully Submitted,

s/Richard Dvorak
_____
Richard Dvorak, attorney for
Plaintiff-Appellant David Rhein

Richard Dvorak
Dvorak Law Offices, LLC
6262 Kingery Highway, Suite 305
Willowbrook, IL 60527
Ph: (312) 593-7146
Fax: (312) 873-3869

## PROOF OF SERVICE

The undersigned, counsel for the Plaintiff-Appellant, hereby certifies that on

December 17, 2015 two copies of the Brief and Required Short Appendix of

Plaintiffs-Appellants will be delivered by depositing same in the U.S. mail to

counsel for Defendant-Appellee.

Respectfully Submitted,

s/Richard Dvorak
_____
Richard Dvorak, attorney for
Plaintiff-Appellant David Rhein

Richard Dvorak
Dvorak Law Offices, LLC
6262 Kingery Highway, Suite 305
Willowbrook, IL 60527
Ph: (312) 593-7146
Fax: (312) 873-3869

## CIRCUIT RULE 30(D) STATEMENT
## ATTACHED REQUIRED SHORT APPENDIX

Pursuant to Circuit Rule 30(d), counsel certifies that all material required by

Circuit Rule 30(a) and (b) are included in the Short Appendix.

Respectfully Submitted,

s/Richard Dvorak

_____

Richard Dvorak, attorney for
Plaintiff-Appellant David Rhein

Richard Dvorak
Dvorak Law Offices, LLC
6262 Kingery Highway, Suite 305
Willowbrook, IL 60527
Ph: (312) 593-7146
Fax: (312) 873-3869

**CIRCUIT COURT RULE 30 REQUIRED SHORT APPENDIX**

**TABLE OF CONTENTS**

*Rule 30(a) Contents.*

Docket Entry for Summary Judgment in Defendant-Appellee's Favor ……………………….. 1

Judgement Order ………………………………………………………………………....…2

Court Order on Motions for Summary Judgment ……………………………………………….3

*Rule 30(b) Contents.*

Court Order on Defendant-Appellee's Motion to Dismiss ………………….…………….. 22

Plaintiff-Appellant's Statement of Facts
compiled in conjunction with Motions for Summary Judgment ……………………………35

**UNITED STATES DISTRICT COURT**
**FOR THE Northern District of Illinois – CM/ECF LIVE, Ver 6,1**
**Eastern Division**

David Rhein, et al.

                    Plaintiff,

v.                                 Case No.: 1:13–cv–00843
                                 Honorable Gary Feinerman

John Coffman, et al.

                    Defendant.

**NOTIFICATION OF DOCKET ENTRY**

This docket entry was made by the Clerk on Thursday, August 6, 2015:

      MINUTE entry before the Honorable Gary Feinerman:For the reasons set forth in the accompanying Memorandum Opinion and Order, Defendant John Coffman's summary judgment motion [65] is granted and Plaintiff David Rhein's summary judgment motion [69] is denied. Enter judgment order. Status hearing set for 8/17/2015 [58] is stricken. Civil case closed.Mailed notice.(jlj, )

**ATTENTION:** This notice is being sent pursuant to Rule 77(d) of the Federal Rules of Civil Procedure or Rule 49(c) of the Federal Rules of Criminal Procedure. It was generated by CM/ECF, the automated docketing system used to maintain the civil and criminal dockets of this District. If a minute order or other document is enclosed, please refer to it for additional information.

For scheduled events, motion practices, recent opinions and other information, visit our web site at ***www.ilnd.uscourts.gov***.

Appendix P.1

ILND 450 (Rev. 10/13) Judgment in a Civil Action

# IN THE UNITED STATES DISTRICT COURT
## FOR THE
## NORTHERN DISTRICT OF ILLINOIS

Rhein et al,

Plaintiff(s),

v.

Pryor et al,

Defendant(s).

Case No.  13 C 843

Judge

## JUDGMENT IN A CIVIL CASE

Judgment is hereby entered (check appropriate box):

☐     in favor of plaintiff(s)
and against defendant(s)
in the amount of $      ,

        which ☐ includes     pre–judgment interest.
               ☐ does not include pre–judgment interest.

Post-judgment interest accrues on that amount at the rate provided by law from the date of this judgment.

Plaintiff(s) shall recover costs from defendant(s).

---

☐     in favor of defendant(s)
and against plaintiff(s)

. 

Defendant(s) shall recover costs from plaintiff(s).

---

☒     other: Judgment is entered in favor of Defendants Hiram Grau and John Coffman and against Plaintiff David Rhein.  The claims involving the remaining parties have been voluntarily dismissed.

---

This action was *(check one)*:

☐ tried by a jury with Judge     presiding, and the jury has rendered a verdict.
☐ tried by Judge     without a jury and the above decision was reached.
☒ decided by Judge Gary Feinerman on a motion for summary judgment.

Date:  8/6/2015                Thomas G. Bruton, Clerk of Court

                              /s/  Jackie Deanes, Deputy Clerk

Appendix P.2

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| DAVID RHEIN, | ) | |
| | ) | |
| Plaintiff, | ) | 13 C 843 |
| | ) | |
| vs. | ) | Judge Feinerman |
| | ) | |
| JOHN COFFMAN, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

David and Kim Rhein brought this suit under 42 U.S.C. § 1983 against Agent Steven
Pryor, Agent Freddie Summers, and Lieutenant John Coffman of the Illinois State Police ("ISP")
in their individual capacities, and ISP Director Hiram Grau in his official capacity.  Doc. 29.
The official capacity claim alleged that § 8(f) of the Illinois Firearm Owners Identification
("FOID") Card Act, 430 ILCS 65/8(f), is facially unconstitutional, while the individual capacity
claims alleged that the revocation of David's FOID card and seizure of his and Kim's firearms
from their home violated the First, Second, Fourth, and Fourteenth Amendments.  The court
dismissed for lack of Article III standing the constitutional challenge to § 8(f).  Docs. 42-43
(reported at 2014 WL 1099157 (N.D. Ill. Mar. 20, 2014)).  Then, by agreement, the remaining
claims were dismissed except for David's Fourteenth Amendment due process claim against
Coffman, which alleges that Coffman failed to provide constitutionally adequate process before
and after revoking David's FOID card.  Doc. 64.  Coffman and David (who henceforth will be
referred to as "Rhein") have filed cross-motions for summary judgment.  Docs. 65, 69.  For the
following reasons, Coffman's motion is granted and Rhein's motion is denied.

Appendix P.3

## Background

When considering Coffman's summary judgment motion, the facts are considered in the light most favorable to Rhein, and when considering Rhein's summary judgment motion, the facts are considered in the light most favorable to Coffman. *See In re United Air Lines, Inc.*, 453 F.3d 463, 468 (7th Cir. 2006) ("With cross summary judgment motions, we construe all facts and inferences therefrom in favor of the party against whom the motion under consideration is made.") (internal quotation marks omitted). On summary judgment, the court must assume the truth of those facts, but does not vouch for them. *See Smith v. Bray*, 681 F.3d 888, 892 (7th Cir. 2012). That said, many of the following facts are undisputed.

Until his FOID card was revoked, Rhein owned firearms and maintained them at his home in his Sauk Village, Illinois, a suburb south of Chicago. Doc. 77 at ¶ 3; Doc. 75 at ¶ 2. On March 10, 2010, Rhein visited the office of State Representative Anthony DeLuca in Springfield to drop off a packet of documents that included a petition requesting answers about why the Constitution was being violated. Doc. 77 at ¶ 9; Doc. 75 at ¶ 6. On March 22, Rhein called DeLuca's district office in Crete, a suburb close to Sauk Village, to ask whether DeLuca had received those documents and to inquire about delivering another set to the Crete office. Doc. 77 at ¶ 10; Doc. 75 at ¶ 6. Rhein spoke with Donna Fanning, DeLuca's District Manager, who reported that Rhein told her that he was "ready to start shooting people." Doc. 77 at ¶¶ 10-11; Doc. 75 at ¶ 6. Rhein left a set of documents at the Crete office later that day. Doc. 77 at ¶ 10. On August 3, Rhein dropped off another set of documents at the Crete office; one document stated that DeLuca should "hang for treason for allowing this state and federal government to piss and shit all over we the people's individual rights." *Id*. at ¶ 13; Doc. 75 at ¶ 8. This prompted Fanning to call the Crete police and turn over the documents to them. Doc. 77 at

Appendix P.4

¶¶ 13-14.  On September 30, Rhein called DeLuca's office and yelled at Fanning.  *Id*. at ¶ 15; Doc. 75 at ¶ 9.

On or about January 14, 2011, Rhein called Fanning and said that he was going to visit the Crete office.  Doc. 75 at ¶ 10; Doc. 77 at ¶ 16.  Fanning alerted the Crete police.  Doc. 77 at ¶ 17.  Rhein delivered another packet of documents and left.  *Id*. at ¶ 18.  The outside of the packet read, "WHATS IN THIS ENEVELOPE ARE FACTS NOT FICTION," "LEARN TO READ THE TRUTH THE WHOLE TRUTH AND NOTHING BUT THE TRUTH SO HELP YOU (GOD)," "IT ALSO EXPLAINS WHY THERE ARE SO MANY FATASS & LAZYASS PEOPLE IN THIS COUNTRY AND STATE," "1812-2012," "WHAT MITE THESE TWO DATES HAVE IN COMMON?" "NEED A HINT."  Doc. 75 at ¶ 10 (original spelling preserved).  The packet contained, among other things, copies of the Declaration of Independence, the Constitution, and a biography of the Attorney General of Illinois.  *Id*. at ¶ 11.  On various pages, Rhein wrote, among other things, "Now you know why so many of your people or going to be shot because your too selfish too understand the truth," "Constitutional Convention—Artical XII State Second Amendment Fed Now you know why you may be next," "You all need to take a step back and take a look at what you are doing to this state.  Befor[e] we the people go Second Amendment on your assess."  *Id*. at ¶¶ 11-12 (most original spelling preserved).  Rhein drew a crosshairs symbol on one page.  *Id*. at ¶ 11.

Rhein does not remember contacting DeLuca's office after January 14, 2011.  *Id*. at ¶ 14.  However, Fanning avers in a sworn statement that Rhein called and visited DeLuca's office again on January 25.  Doc. 67-6 at ¶¶ 9-13.  Fanning further avers that Rhein told her he was a member of the Illinois State Militia and that she feared that he posed a threat, which prompted her to ask her husband to join her at the office.  *Id*. at ¶¶ 9-10; Doc. 77 at ¶ 20; Doc. 75 at ¶ 13.

Appendix P.5

Fanning described Rhein's body language during his hour long "rant" as "very animated," and recalled him yelling "for extended periods of time" and referring to 2012 as "a year of revolution and overthrowing the government." Doc. 67-6 at ¶¶ 11-12. Although Rhein disputes that he did this on January 25, the parties agree that he referred to himself as a "sacrifice lamb" and also that he told Fanning, "I have never shot anybody in my life, and I never would shoot anyone, unless I am forced to—to protect my constitutional rights." Doc. 75 at ¶¶ 15-16. Fanning informed the Crete police and the ISP Statewide Terrorism Intelligence Center about her interactions with Rhein. *Id*. at ¶ 17.

ISP special agents told Lieutenant Coffman, who at the time was Chief of the ISP's Bureau of Firearm Services, that Rhein had made threats to DeLuca's office. *Id*. at ¶¶ 1, 4. The agents sent Coffman a written summary prepared by Fanning of Rhein's statements and actions, together with documents that she had received from Rhein. *Id*. at ¶¶ 5, 18. Fanning's summary indicated that Rhein told her that he was "ready to start shooting people" and would "kick the Governor's ass," and that he referred to himself as a "sacrifice lamb." *Id*. at ¶ 5.

On February 3, 2011, based on the information provided to him, Coffman revoked Rhein's FOID card pursuant to § 8(f) of the FOID Card Act, and wrote a letter to Rhein to that effect. *Id*. at ¶¶ 19-20; Doc. 77 at ¶ 37. Section 8(f) allows the ISP to revoke the FOID card of an individual "whose mental condition is of such a nature that it poses a clear and present danger to [the individual], any other person or persons or the community." 430 ILCS 65/8(f). Section 1.1 of the Act defines "[c]lear and present danger" as "a person who: (1) communicates a serious threat of physical violence against a reasonably identifiable victim …; or (2) demonstrates threatening physical or verbal behavior, such as violent … or assaultive threats, actions, or other behavior, as determined by a … law enforcement official." 430 ILCS 65/1.1. ISP policy is to

Appendix P.6

not interview a cardholder prior to revocation under § 8(f). Doc. 75 at ¶ 21. ISP agents handle pre-revocation investigations, and decisionmakers rely on the investigations when deciding whether revocation is appropriate. *Ibid*. Due to the nature of the risks to public safety involved, Coffman did not conduct an independent investigation before revoking Rhein's FOID card. *Id*. at ¶¶ 21-22.

On or about February 4, 2011, a local police officer visited Rhein's home and told him that ISP agents were waiting for him at the police station. Doc. 77 at ¶ 41. Rhein accompanied the officer to the station, where he was interviewed by Agents Pryor and Summers and informed that his FOID card had been revoked and that he would need to surrender his firearms. *Id*. at ¶¶ 42-43. Rhein "spoke passionately" but remained calm during the interview. *Id*. at ¶ 54. He expressed readiness to challenge DeLuca in the next election and said that his comments had been meant to get people's attention. *Id*. at ¶¶ 45-46. Local police and Agent Pryor then removed Rhein's firearms from his home. *Id*. at ¶ 59. Rhein immediately asked about retrieving his firearms and was told to consult the FOID card revocation letter. *Id*. at ¶¶ 61-62.

The standard revocation letter, which Rhein received, instructs an individual who desires reinstatement to contact the ISP's Bureau of Firearm Services. *Id*. at ¶ 74. It further states that the recipient should obtain a letter of recommendation from the local police department or sheriff's office, a letter from a psychologist attesting to his suitability to acquire, possess, and use firearms, and at least three letters of recommendation from character references. *Id*. at ¶ 75. If those documents show that the clear and present danger no longer exists, the individual's FOID card may be reinstated without an in-person hearing. Doc. 75 at ¶ 26. If a an in-person hearing is requested, the Bureau forwards to ISP's legal department the individual's documents along with relevant information from any objecting parties, local law enforcement officers, and ISP

Appendix P.7

agents. *Id*. at ¶ 27. The decision whether an individual is entitled to an in-person hearing rests with ISP's legal department. *Id*. at ¶ 28. It can take over a year after a request to receive a hearing. *Id*. at ¶ 25.

On August 1, 2011, Rhein's attorney sent a letter to Coffman requesting reinstatement of Rhein's FOID card; the Bureau received the letter on August 8, 2011. Doc. 77 at ¶ 81; Doc. 68-3 at 79. The letter included a psychological report written by Dr. Alan Childs and three character reference letters. Doc. 77 at ¶ 82. Dr. Childs's report concluded, "[I]t is my professional and clinical opinion that [Rhein] does not present as an individual that is dangerous to himself or others." *Id*. at ¶ 83. The materials were placed in Rhein's file. Doc. 75 at ¶ 37. On September 19, 2011, Rhein's attorney sent Coffman a follow-up letter. Doc. 77 at ¶ 84.

Rhein's attorney sent another letter on January 19, 2012. Doc. 75 at ¶ 41. That letter was the first communication in which Rhein (through his attorney) formally requested a hearing. *Id*. at ¶ 40. After receiving the letter, Coffman told ISP staff to contact Rhein's attorney and forwarded the hearing request to ISP's legal department. *Id*. at ¶ 41. On January 24, 2012, ISP Colonel Patrick Keen sent the Bureau of Firearm Services a memorandum regarding Rhein's hearing request. Doc. 77 at ¶ 94. In February 2012, Coffman was transferred out of the Bureau of Firearm Services to ISP's Division of Operations, at which point he had no further involvement with Rhein's request for a hearing or reinstatement. Doc. 75 at ¶¶ 42-43.

On March 11, 2012, an internal ISP email noted that Rhein's attorney had requested a hearing "last year" but had not received a response. Doc. 77 at ¶ 95. On April 12, 2012, Rhein filed suit in state court seeking reinstatement of his FOID card and return of his weapons. *Id*. at ¶ 98. On June 5, 2012, ISP reinstated Rhein's FOID card, and his firearms were returned to him on August 29, 2012. *Id*. at ¶¶ 99-101; Doc. 75 at ¶ 44. Rhein filed this suit on February 1, 2013.

Appendix P.8

**Discussion**

Rhein argues that Coffman violated procedural due process by not conducting a hearing before revoking his FOID card and in his handling of Rhein's post-revocation requests for reinstatement. Coffman seeks judgment on both components of Rhein's claim, contending that Rhein was not constitutionally entitled to a pre-deprivation hearing and that he did not unconstitutionally delay Rhein's post-deprivation hearing, and that even if he did violate Rhein's due process rights, those rights were not clearly established when the violations occurred. For the following reasons, Coffman is correct that due process did not entitle Rhein to a pre-deprivation hearing. Coffman also is correct that even if his post-revocation conduct violated Rhein's due process rights, he is entitled to qualified immunity because he did not violate clearly established law.

**I.       Pre-Deprivation Claim**

 "The doctrine of qualified immunity protects government officials from liability for civil damages when their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *McAllister v. Price*, 615 F.3d 877, 881 (7th Cir. 2010). "When confronted with a claim for qualified immunity, [the court] must address two questions: whether the plaintiff's allegations make out a deprivation of a constitutional right, and whether the right was clearly established at the time of defendant's alleged misconduct." *Ibid*. "In a § 1983 case, the plaintiff bears the burden of proof on the constitutional deprivation that underlies the claim, and thus must come forth with sufficient evidence to create genuine issues of material fact to avoid summary judgment." *Ibid*.

The first question in the qualified immunity analysis asks whether, viewing the record in the light most favorable to Rhein, Coffman violated Rhein's procedural due process rights by

Appendix P.9

revoking his FOID card under § 8(f) of the FOID Card Act without first holding a hearing. "A procedural due process claim requires a two-fold analysis. First, [the court] must determine whether the plaintiff was deprived of a protected interest; second, [the court] must determine what process is due." *Leavell v. Ill. Dep't of Natural Res.*, 600 F.3d 798, 804 (7th Cir. 2010). Coffman does not dispute that Rhein had a protectable interest in his FOID card, so the court must resolve whether Rhein was entitled to a pre-deprivation hearing.

"[The] general rule [is] that individuals must receive notice and an opportunity to be heard before the Government deprives them of property." *United States v. James Daniel Good Real Prop.*, 510 U.S. 43, 48 (1993). However, the Supreme Court "has recognized, on many occasions, that where a State must act quickly, or where it would be impractical to provide predeprivation process, postdeprivation process satisfies the requirements of the Due Process Clause." *Gilbert v. Homar*, 520 U.S. 924, 930 (1997) (collecting cases); *see also James Daniel Good*, 510 U.S. at 53; *Siebert v. Severino*, 256 F.3d 648, 659 (7th Cir. 2001) ("Absent exigent circumstances, or a random or unforeseen act, a pre-deprivation procedure is generally required before the government may deprive a person of [his] property."). The question, then, is whether the revocation of Rhein's FOID card under § 8(f) justified such an exception.

The three-part standard articulated in *Mathews v. Eldridge*, 424 U.S. 319 (1976) guides the inquiry. *See Siebert*, 256 F.3d at 659-60. The *Mathews* test requires consideration of: (1) the private interest affected by the official action; (2) the risk of an erroneous deprivation of that interest through the procedures used, and the probable value of additional safeguards; and (3) the Government's interest, including the administrative burden that additional procedural requirements would entail. *See Mathews*, 424 U.S. at 335; *Armstrong v. Daily*, 786 F.3d 529, 545 (7th Cir. 2015). "The relevant inquiry is not what additional procedures might be helpful but

Appendix P.10

whether the existing procedures are constitutionally defective because they present an unreasonable risk of an erroneous deprivation of the private interest, in light of the particular situation …." *Clancy v. Office of Foreign Assets Control*, 559 F.3d 595, 600 (7th Cir. 2009).

As for the first *Mathews* factor, the parties agree that Rhein had a protectable interest in in his FOID card, but they disagree about its weight. No person in Illinois "may acquire or possess any firearm" without a valid FOID card, 430 ILCS 65/2(a)(1), so Rhein's FOID card was the key to possessing his guns. As a general rule, an individual's interest in possessing his guns is strong, as explained at length in *McDonald v. City of Chicago*, 561 U.S. 742, 767-80 (2010), and *Moore v. Madigan*, 702 F.3d 933, 935-42 (7th Cir. 2012). However, the Supreme Court has cautioned that this interest, while strong, is "not unlimited," and made clear that it did not intend to "cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill." *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008). The record does not indicate that Rhein is felon, and he may not have technically qualified as mentally ill when his FOID card was revoked in February 2011. But the Supreme Court emphasized that its list of "lawful regulatory measures … does not purport to be exhaustive," *id*. at 627 n.26, and the threats that Coffman was told that Rhein had made—including "Now you know why so many of your people or going to be shot because your too selfish too understand the truth," and "You all need to take a step back and take a look at what you are doing to this state. Befor[e] we the people go Second Amendment on your assess"—could have prompted the reasonable conclusion that Rhein was mentally imbalanced and that allowing him to keep his weapons posed too much of a risk to tolerate. *See United States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010) (en banc) (noting that a report identified by *Heller* as a "highly influential precursor to the Second Amendment" "asserted that citizens have a personal right to bear arms 'unless for crimes

Appendix P.11

committed, or real danger to public safety'") (internal quotation marks omitted); C. Kevin Marshall, "Why Can't Martha Stewart Have A Gun," 32 *Harv. J.L. & Pub. Pol'y* 695, 698 (2009) ("actual 'longstanding' precedent in America and pre-Founding England suggests that a firearms disability can be consistent with the Second Amendment to the extent that … its basis credibly indicates a present danger that one will misuse arms against others and the disability redresses that danger").

The second *Mathews* factor is the risk of an erroneous deprivation of the private interest inherent in the procedures used and the probable value of additional safeguards. Coffman decided to revoke Rhein's FOID card based on information gathered and an investigation conducted by ISP agents, which indicated that Rhein had threatened DeLuca, including with strong and repeated suggestions of gun violence, over the course of several months. ISP agents relied on Fanning's statements to ISP and local police about her interactions with Rhein, as well as the documents that Rhein himself dropped off at DeLuca's offices. As far as Coffman knew, Rhein had said he was "ready to start shooting people," that he would "kick [the Governor's] ass," and that he was a "sacrifice lamb." Coffman also had information that Rhein stated that DeLuca should "hang for treason," and said "Now you know why so many of your people or [sic] going to be shot" and that he might "go Second Amendment on your assess"; given the subject matter of the Second Amendment, the phrase "go Second Amendment on your assess" is most naturally understood as a reference to shooting people with a gun. Nothing in the record indicates that there was any reason to doubt the information that ISP had gathered, and it was reasonable for Coffman to treat Rhein's statements and conduct as presenting a "clear and present danger" under § 8(f) in that he had communicated a "serious threat of physical violence against a reasonably identifiable victim." 430 ILCS 65/1.1. Not allowing a FOID card holder to

Appendix P.12

rebut evidence of a serious threat of gun violence before revoking his FOID card involves some

risk of an erroneous deprivation based on misunderstanding or misinterpretation. However, the

value of additional pre-deprivation procedures is low—particularly where, as here, many of

Rhein's threatening statements were in his own hand—and the burden on law enforcement and

the costs to society are potentially high and possibly fatal. *See Mackey v. Montrym*, 443 U.S. 1,

13 (1979) ("The Due Process Clause simply does not mandate that all governmental

decisionmaking comply with standards that assure perfect, error-free determinations.").

      The third *Mathews* factor is the government's interest, including the administrative

burden that additional procedural requirements would entail. The government's interest in

ensuring public safety is extremely important. *See Skoien*, 614 F.3d at 642 ("no one doubts that

… preventing armed mayhem … is an important governmental objective"). It provides perhaps

the quintessential example of when not providing a pre-deprivation hearing is constitutionally

permissible. *See Gilbert*, 520 U.S. at 930 ("where a State must act quickly … post-deprivation

process satisfies the requirements of the Due Process Clause"); *Hodel v. Va. Surface Mining &*

*Reclamation Ass'n*, 452 U.S. 264, 300 (1981) ("[D]eprivation of property to protect the public

health and safety is one of the oldest examples of permissible summary action.") (internal

quotation marks omitted). The interest in preventing a threatening and perceivably dangerous

person from using firearms in acts of violence is equally, if not more, important as other

governmental interests held substantial enough to justify summary action without pre-deprivation

hearings, such as assuring the integrity of horse racing, *see Barry v. Barchi*, 443 U.S. 55, 63-64

(1979); removing drunk drivers from highways, *see Mackey*, 443 U.S. at 17; seizing mislabeled

drugs, *see Ewing v. Mytinger & Casselberry, Inc.*, 339 U.S. 594, 600 (1950); and destroying

spoiled food products, *N. Am. Cold Storage Co. v. City of Chicago*, 211 U.S. 306, 319-20 (1908).

Appendix P.13

The government's interest in protecting public safety is particularly acute where time is of the essence and the delay involved in conducting a pre-deprivation hearing could mean the difference between life and death. *See Spinelli v. City of N.Y.*, 579 F.3d 160, 170 (2d Cir. 2009) (finding that "exigent circumstances necessitating very prompt action on the part of the City were sufficient to justify the City's failure to provide [the plaintiff gun shop] with pre-deprivation notice or hearing" before revoking the plaintiff's gun dealer license) (internal quotation marks omitted). This factor weighs heavily in favor of Coffman, whose decision to revoke Rhein's FOID card was based on an ISP investigation indicating that Rhein was prepared to use gun violence. That information warranted immediate action and exemplifies circumstances where the necessity of quick state action can override the general preference for a pre-deprivation hearing. *See Doyle v. Camelot Care Ctrs., Inc.*, 305 F.3d 603, 618 (7th Cir. 2002) ("[T]he practical exigencies of a situation may often counsel against affording plenary pre-deprivation process to an individual."); *Hightower v. City of Boston*, 693 F.3d 61, 85 (1st Cir. 2012) (collecting cases) ("The revocation of a firearms license, particularly a license to carry a concealed, large capacity weapon, without a predeprivation hearing is justified by concerns as to public health and safety."). We are all too familiar, in Illinois and elsewhere, with tragedies in which public officials—and, at times, their staffs and family members—are seriously injured or killed by armed individuals upset with decisions that the officials have made or actions they have taken, and Rhein appeared to be presenting just such a risk to DeLuca and his staff.

Balancing the benefits and costs of a pre-deprivation hearing under these circumstances leads inexorably to the conclusion that Rhein was not constitutionally entitled to such a hearing. It was permissible for Coffman to act quickly, without a pre-deprivation hearing, and it probably would have been irresponsible of him to act with any less dispatch. That a pre-deprivation

Appendix P.14

hearing was not required, however, does not mean that Rhein was entitled to no hearing at all; it means only that the lack of a pre-deprivation hearing did not violate due process so long as he had the right to a post-deprivation hearing. *See FDIC v. Mallen*, 486 U.S. 230, 240 (1988) ("An important government interest, accompanied by a substantial assurance that the deprivation is not baseless or unwarranted, may in limited cases demanding prompt action justify postponing the opportunity to be heard until after the initial deprivation.").

Rhein did have that right, as the FOID Card Act clearly sets forth procedures available to those whose FOID cards are revoked. Section 9 requires the ISP to provide such a person with "a written notice … stating specifically the grounds upon which … his Identification Card has been revoked … [and setting forth] the person's right to administrative or judicial review under Section 10 and 11 of this Act." 430 ILCS 65/9. Coffman complied with this requirement in his letter to Rhein of February 3, 2011. Doc. 75 at ¶ 20, Doc. 67-9. Section 10 states that a person whose FOID card is revoked "may appeal to the Director of State Police for a hearing upon such … revocation." 430 ILCS 65/10(a). Section 10 further provides:

> The Director shall grant the relief if it is established by a preponderance of the evidence that the person will not be likely to act in a manner dangerous to public safety and that granting relief would not be contrary to the public interest. In making this determination, the Director shall receive evidence concerning (i) the circumstances regarding the firearms disabilities from which relief is sought; (ii) the petitioner's mental health and criminal history records, if any; (iii) the petitioner's reputation, developed at a minimum through character witness statements, testimony, or other character evidence; and (iv) changes in the petitioner's condition or circumstances since the disqualifying events relevant to the relief sought. If relief is granted under this subsection or by order of a court under this Section, the Director shall as soon as practicable but in no case later than 15 business days, update, correct, modify, or remove the person's record in any database that the Department of State Police makes available to the National Instant Criminal Background Check System and notify the United States Attorney General that the basis for the record being made available no longer applies.

Appendix P.15

430 ILCS 65/10(f). Section 11 provides for *de novo* judicial review of the Director's decision: "Any final administrative decision by the Director of State Police to deny a person's application for relief under [§ 10(f)] of this Act is subject to de novo judicial review by the circuit court, and any party may offer evidence that is otherwise proper and admissible without regard to whether that evidence is part of the administrative record." 430 ILCS 65/11(b). These procedures offer substantial opportunity to challenge the revocation of a FOID card, first in an administrative setting and then through judicial review.

Weighing the *Mathews* factors and considering the post-deprivation procedures available through the FOID Card Act, the court concludes that Coffman did not violate Rhein's procedural due process rights by revoking his FOID card without first conducting a hearing. *See Doyle*, 305 F.3d at 618. Accordingly, Coffman is entitled to summary judgment on Rhein's claim that the lack of a pre-deprivation hearing violated due process.

## II. Post-Deprivation Claim

Rhein next claims that Coffman violated his procedural due process rights by failing to provide "a prompt and meaningful post-deprivation hearing." Doc. 70 at 9. Rather than decide whether the delay in providing post-deprivation hearing violated due process, the court will exercise its discretion to answer the second qualified immunity question, which is whether the delay violated clearly established law. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009); *Mordi v. Zeigler*, 770 F.3d 1161, 1165 (7th Cir. 2014). That issue turns on whether a reasonable officer in Coffman's position would have known that his role in delaying Rhein's post-deprivation hearing violated due process. *See Humphries v. Milwaukee Cnty.*, 702 F.3d 1003, 1006 (7th Cir. 2012).

Appendix P.16

As noted above, even when due process does not demand a pre-deprivation hearing, it requires a post-deprivation opportunity to be heard "at a meaningful time and in a meaningful manner." *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965); *see also Barry*, 443 U.S. at 66. "While there is no specific time frame within which a hearing must be held to qualify as 'prompt,' lack of a speedy resolution to proceedings may result in a denial of due process." *Baird v. Bd. of Educ. for Warren Cmty. Unit Sch. Dist. No. 205*, 389 F.3d 685, 692 (7th Cir. 2004). The delay here was between August 8, 2011, when the Bureau of Firearm Services stamped "received" on a letter from Rhein's attorney requesting reinstatement of his FOID card, Doc. 68-3 at 79, and early February 2012, when Coffman was transferred to ISP's Division of Operations and no longer involved with Rhein's request for a hearing, Doc. 75 at ¶¶ 42-43. Although Rhein's FOID card was not reinstated until June 5, 2012, Coffman's responsibility ceased with his personal involvement in the matter. *See Matz v. Klotka*, 769 F.3d 517, 528 (7th Cir. 2014) ("A damages suit under § 1983 requires that a defendant be personally involved in the alleged constitutional deprivation."); *Palmer v. Marion Cnty.*, 327 F.3d 588, 594 (7th Cir. 2003); *Hildebrandt v. Ill. Dep't of Natural Res.*, 347 F.3d 1014, 1039 (7th Cir. 2003); *Vance v. Peters*, 97 F.3d 987, 991 (7th Cir. 1996).

To overcome qualified immunity, Rhein must show that it was clearly established that the six-month delay between his initial request for reinstatement and Coffman's leaving the Bureau—or, if Coffman were held responsible through June 2012, the ten-month delay between Rhein's initial request and his FOID card's reinstatement—was an unconstitutionally lengthy delay. *See Nanda v. Moss*, 412 F.3d 836, 844 (7th Cir. 2005). "To be clearly established, a right must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right. In other words, existing precedent must have placed the statutory or

Appendix P.17

constitutional question beyond debate." *Reichle v. Howards*, 132 S. Ct. 2088, 2093 (2012)
(internal citations, quotations marks, and alterations omitted).

The trouble with Rhein's position is that the question of how long is "too long" for an
individual FOID cardholder to go without a hearing after revocation was not clearly established
in 2011 and 2012, and the precise answer remains unclear even today. The Supreme Court has
held that, "though there is a point at which an unjustified delay in completing a post-deprivation
proceeding would become a constitutional violation, the significance of such a delay cannot be
evaluated in a vacuum." *Mallen*, 486 U.S. at 242 (internal quotation marks and citation omitted).
Whether the delay in providing a post-deprivation hearing violates due process depends upon an
assessment of *Mathews*-like factors: "[I]t is appropriate to examine the importance of the private
interest and the harm to this interest occasioned by delay; the justification offered by the
Government for delay and its relation to the underlying government interest; and the likelihood
that the interim decision may have been mistaken." *Ibid.*; *see also Zinermon v. Burch*, 494 U.S.
113, 127 (1990); *Dupuy v. Samuels*, 397 F.3d 493, 509 (7th Cir. 2005).

That multi-factor standard, which necessarily involves the balancing of various
considerations, does not clearly establish that the six-month (or ten-month) delay at issue here
fell below the constitutional line. As the Seventh Circuit has explained: "It would appear that,
whenever a balancing of interests is required, the facts of the existing caselaw must closely
correspond to the contested action before the defendant official is subject to liability under the
*Harlow* [qualified immunity standard]. With *Harlow*'s elimination of the inquiry into the actual
motivations of the official, qualified immunity typically casts a wide net to protect government
officials from damage liability whenever balancing is required." *Benson v. Allphin*, 786 F.2d
268, 276 (7th Cir. 1986), *superseded by statute on other grounds as stated in Laborers' Pension*

Appendix P.18

*Fund v. A&C Envtl., Inc.*, 301 F.3d 768, 778 (7th Cir. 2002); *see also Crue v. Aiken*, 370 F.3d 668, 688 (7th Cir. 2004) ("Here, both *Pickering/Connick* and *NTEU* involve balancing tests and, unless there is 'very closely analogous' case law, the balance struck by the official will not remove qualified immunity."); *Gustafson v. Jones*, 117 F.3d 1015, 1021 (7th Cir. 1997) (noting "an undeniable fact about balancing tests, which is that they produce a wide gray area between the clearly legal and the clearly illegal," meaning that "the rules of qualified immunity require giving the benefit of the doubt to the reasonable public official if the particular case falls within that gray area"); *Shinault v. Hawks*, 782 F.3d 1053, 1059 (9th Cir. 2015) ("Because the *Mathews* test boils down to an ad hoc balancing inquiry, procedural due process requirements can rarely be considered clearly established at least in the absence of closely corresponding factual and legal precedent.") (internal quotation marks omitted); *Comprehensive Addiction Treatment Ctr., Inc. v. Leslea*, 552 F. App'x 812, 817 (10th Cir. 2014) ("the *Mathews* balancing test renders it difficult … for state officials to know that they have violated clearly established law") (internal quotation marks omitted, ellipses in original). There is no analogous case that would have put Coffman on notice that the six-month or ten-month delay in providing Rhein a post-revocation hearing violated due process. *See Collvins v. Hackford*, 523 F. App'x 515, 520-21 (10th Cir. 2013) (holding that the defendants were entitled to qualified immunity on the plaintiff's claim that an *eleven-month* delay in providing a post-deprivation hearing was constitutionally excessive, explaining that "the determination of the constitutionality of a delay is a fact-intensive analysis based on the [*Mallen*] factors" and that "[t]here is no precedent sufficiently on point with this case that could have put Defendants on notice that the delay was unconstitutional"); *Torbeck v. Zoon*, 1997 WL 532496, at *2-3 (4th Cir. Aug. 29, 1997) (citable pursuant to 4th Cir.

Appendix P.19

Rule 32.1) (same, where there was a *two-year* delay in holding a hearing after the plaintiff's business license was suspended).

In an effort to find a closely corresponding case, Rhein cites *Spinelli*, where the Second Circuit in 2009 held that a 58-day delay in providing a post-deprivation hearing following the suspension of the plaintiff's gun dealer license violated due process given that the plaintiff could not earn income while it awaited a hearing. 579 F.3d at 173-74. In so holding, the Second Circuit placed great emphasis on the strength of the plaintiff's interest in "pursuing a particular livelihood," quoting *Mallen* for the proposition that "[t]he Supreme Court has repeatedly recognized the severity of depriving someone of his or her livelihood," and observing that "the interim period between the erroneous deprivation and reinstatement can be financially devastating to the licensee." *Id*. at 171 (internal quotation marks omitted). The fact that the business license at issue in *Spinelli* allowed the plaintiff to engage in the business of selling guns was entirely incidental to the analysis; *Spinelli* is a business license case, not a gun ownership case. *Spinelli* would not have put Coffman on notice that the delay in *this* case was too long, given differences in the nature of the private interests at stake. Although Rhein's interest in his FOID card was substantial, Coffman reasonably could have believed, in light of *Spinelli*'s reliance on *Mallen* and focus on the financial aspects of the license suspension, that Rhein's interest did not rise to the level of the interest in pursuing one's livelihood at stake in *Spinelli*.

Thus, even if Coffman could fairly be charged with knowing that the Second Circuit had held that a 58-day delay in providing a hearing after the revocation of a gun dealer license necessary to the plaintiff's livelihood would violate due process, the same could not be said of a six-month or ten-month delay in processing an application to restore a FOID card. *See Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2083 (2011) ("We do not require a case directly on point, but

Appendix P.20

existing precedent must have placed the statutory or constitutional question beyond debate.");

*Lewis v. Downey*, 581 F.3d 467, 478 (7th Cir. 2009) ("the right that [the defendant] allegedly

violated must be clearly established in a particularized sense") (internal quotations marks

omitted); *cf. Shepard v. Madigan*, 734 F.3d 748, 749 (7th Cir. 2013) (noting that the court in

*Moore v. Madigan*, 702 F.3d 933 (7th Cir. 2013), had given the State of Illinois "210 days in

which to enact a new gun law that would impose only reasonable restrictions on carrying guns

outside the home, rather than the restrictions that we held [under the Second Amendment] to be

unduly severe"). Even if that delay ultimately could be held to violate due process, the question

is certainly not "beyond debate," which means that qualified immunity is appropriate. *Reichle*,

132 S. Ct. at 2093. Qualified immunity protects "all but the plainly incompetent or those who

knowingly violate the law." *Al-Kidd*, 131 S. Ct. at 2085. Given the state of the law, Coffman

was neither plainly incompetent nor a knowing violator of the law, and thus he is entitled to

qualified immunity on the post-deprivation claim.

### Conclusion

For the foregoing reasons, Coffman's summary judgment motion is granted. Given this

disposition, Rhein's summary judgment motion necessarily is denied.

August 6, 2015

_____

United States District Judge

19

Appendix P.21

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| KIM RHEIN and DAVID RHEIN, | ) | |
| | ) | |
| Plaintiffs, | ) | 13 C 843 |
| | ) | |
| vs. | ) | Judge Feinerman |
| | ) | |
| AGENT STEVEN PRYOR, Star Number 4816, an Illinois | ) | |
| State Police Officer, in his individual capacity; AGENT | ) | |
| FREDDIE SUMMERS, Star Number 5706, an Illinois | ) | |
| State Police Officer, in his individual capacity; | ) | |
| LIEUTENANT JOHN COFFMAN, an Illinois State Police | ) | |
| Officer, in his individual capacity; and HIRAM GRAU, | ) | |
| Illinois State Police Director, in his official capacity, | ) | |
| | ) | |
| Defendants. | ) | |

### MEMORANDUM OPINION AND ORDER

Kim Rhein and David Rhein bring this suit under 42 U.S.C. § 1983 against Agent Steven

Pryor, Agent Freddie Summers, and Lieutenant John Coffman of the Illinois State Police in their

individual capacities, and against Illinois State Police Director Hiram Grau in his official

capacity. The official capacity claim alleges that § 8(f) of the Illinois Firearm Owners

Identification ("FOID") Card Act, which provides that the State Police may revoke a person's

FOID card upon finding that the person's "mental condition is of such a nature that it poses a

clear and present danger to the applicant, any other person or persons or the community," 430

ILCS 65/8(f), is facially unconstitutional. Doc. 29. The individual capacity claims allege that

the revocation of David's FOID card pursuant to § 8(f) and the seizure of David's and Kim's

firearms from their home violated the First, Second, Fourth, and Fourteenth Amendments. *Ibid*.

The official capacity claim seeks injunctive and declaratory relief, while the individual capacity

claims seek damages. *Id*. at ¶¶ 4, 6 and p. 6. Defendants have moved to dismiss the amended

Appendix P.22

complaint.  Doc. 26.  The motion is granted as to the official capacity claim and denied as to the individual capacity claims.

## Background

In considering the motion to dismiss, the court assumes the truth of the amended complaint's factual allegations, though not its legal conclusions.  *See Munson v. Gaetz*, 673 F.3d 630, 632 (7th Cir. 2012).  The court also must consider "documents attached to the [amended] complaint, documents that are critical to the [amended] complaint and referred to in it, and information that is subject to proper judicial notice," along with additional facts set forth in Plaintiffs' brief opposing dismissal, so long as those facts "are consistent with" the amended complaint.  *Geinosky v. City of Chicago*, 675 F.3d 743, 745 n.1 (7th Cir. 2012).  The following facts are set forth as favorably to Plaintiffs as these materials allow.  *See Gomez v. Randle*, 680 F.3d 859, 864 (7th Cir. 2012).

The FOID Card Act provides that no person in Illinois "may acquire or possess any firearm … within this State without having in his or her possession a Firearm Owner's Identification Card previously issued in his or her name by the Department of State Police under the provisions of this Act."  430 ILCS 65/2(a)(1).  Section 8(f) of the Act allows the Illinois Department of State Police to "revoke and seize a [FOID] Card previously issued under this Act … if the Department finds that the … person to whom such card was issued is or was at the time of issuance: … [a] person whose mental condition is of such a nature that it poses a clear and present danger to the applicant, any other person or persons or the community."  430 ILCS 65/8(f).  The Act recently was amended to define "clear and present danger" to mean "a person who: (1) communicates a serious threat of physical violence against a reasonably identifiable victim or poses a clear and imminent risk of serious physical injury to himself, herself, or another

Appendix P.23

person as determined by a physician, clinical psychologist, or qualified examiner; or (2)

demonstrates threatening physical or verbal behavior, such as violent, suicidal, or assaultive

threats, actions, or other behavior, as determined by a physician, clinical psychologist, qualified

examiner, school administrator, or law enforcement official."  430 ILCS 65/1.1.

If a person's FOID card is revoked pursuant to § 8(f), the Department must provide the

individual with "a written notice … stating specifically the grounds upon which … his

Identification Card has been revoked … [and setting forth] the person's right to administrative or

judicial review under Section 10 and 11 of this Act."  430 ILCS 65/9.  Section 10 states that a

person whose FOID card is revoked "may appeal to the Director of State Police for a hearing

upon such … revocation."  430 ILCS 65/10(a).  Section 10 further provides:

> The Director shall grant the relief if it is established by a preponderance of the
> evidence that the person will not be likely to act in a manner dangerous to
> public safety and that granting relief would not be contrary to the public
> interest. In making this determination, the Director shall receive evidence
> concerning (i) the circumstances regarding the firearms disabilities from
> which relief is sought; (ii) the petitioner's mental health and criminal history
> records, if any; (iii) the petitioner's reputation, developed at a minimum
> through character witness statements, testimony, or other character evidence;
> and (iv) changes in the petitioner's condition or circumstances since the
> disqualifying events relevant to the relief sought. If relief is granted under this
> subsection or by order of a court under this Section, the Director shall as soon
> as practicable but in no case later than 15 business days, update, correct,
> modify, or remove the person's record in any database that the Department of
> State Police makes available to the National Instant Criminal Background
> Check System and notify the United States Attorney General that the basis for
> the record being made available no longer applies.

430 ILCS 65/10(f).  Section 11 provides for *de novo* judicial review of the Director's decision:

"Any final administrative decision by the Director of State Police to deny a person's application

for relief under [§ 10(f)] of this Act is subject to de novo judicial review by the circuit court, and

any party may offer evidence that is otherwise proper and admissible without regard to whether

that evidence is part of the administrative record."  430 ILCS 65/11(b).

Appendix P.24

As of February 3, 2011, Plaintiffs possessed FOID cards, owned firearms, and kept their firearms in their home. Doc. 29 at ¶¶ 9-11. At some point before February 3, 2011, David expressed "unpopular political views … about his support of Second Amendment rights" to "a locally elected official." *Id*. at ¶¶ 34, 36. That official, somebody in that official's office, or one of the individual defendants falsely construed David's comments "as evidence that [he] had a mental condition that made him dangerous." *Id*. at ¶ 36. On February 3, 2011, Lieutenant Coffman wrote a letter to David revoking his FOID card under § 8(f) of the Act based on the false and unreasonable assertion that David had a "mental condition" within the meaning of that provision. *Id*. at ¶¶ 12, 14, 31. The letter was mailed on February 4, 2011, *id*. at ¶ 13, and David did not receive it until February 7, 2011, *id*. at ¶ 15.

On February 5, 2011, with Lieutenant Coffman's approval, Agents Pryor and Summers entered Plaintiffs' home without a warrant or consent, conducted a search, and seized Plaintiffs' firearms, which Plaintiffs used for personal protection, hunting, investment, and enjoyment. *Id*. at ¶¶ 16-17. These actions were taken even though "[t]here was no reasonable basis to conclude David Rhein had a mental condition that presented a clear and present danger to himself or anyone else." *Id*. at ¶ 23. It follows, the amended complaint claims, that the seizure of Plaintiff's firearms and the revocation of David's FOID card was "in no way … justified under this statute [§ 8(f)]." *Id*. at ¶ 22. Kim's FOID card was not revoked. *Id*. at ¶¶ 11, 30.

Plaintiffs hired an attorney, and in Summer 2012, as a result of a court order, their firearms were returned to them. *Id*. at ¶ 18. Plaintiffs plan to continue engaging in political commentary in support of the Second Amendment, and they fear that their speech will put them at risk of being labeled "mentally unstable and dangerous" and having their firearms seized and FOID cards revoked. *Id*. at ¶¶ 37-38.

4

Appendix P.25

**Discussion**

**I.      Facial Challenge to § 8(f) of the FOID Card Act**

Defendants contend that Plaintiffs lack standing to facially challenge the constitutionality of § 8(f) of the Act.  Doc. 27 at 12-14.  This argument implicates the court's subject matter jurisdiction, and thus must be addressed at the threshold.  *See Citizens Against Ruining the Env't v. EPA*, 535 F.3d 670, 675 (7th Cir. 2008).  Although Defendants press their standing argument under Rule 12(b)(6), the appropriate vehicle is Rule 12(b)(1).  *See Am. Fed'n of Gov't Emps., Local 2119 v. Cohen*, 171 F.3d 460, 465 (7th Cir. 1999) ("Obviously, if a plaintiff cannot establish standing to sue, relief from this court is not possible, and dismissal under [Rule] 12(b)(1) is the appropriate disposition.").  Under governing Seventh Circuit precedent, Plaintiffs lack standing to pursue their facial challenge.

"When the plaintiff applies for prospective relief against a harm not yet suffered—or one he believes he will suffer again—he must establish that he 'is immediately in danger of sustaining some direct injury as the result of the challenged official conduct[,] and [that] the injury or threat of injury [is] both real and immediate, not conjectural or hypothetical.'"  *Bell v. Keating*, 697 F.3d 445, 451 (7th Cir. 2012) (alterations in original) (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983)).  "As a general matter, a plaintiff who wishes to engage in conduct arguably protected by the Constitution, but proscribed by a statute, successfully demonstrates an immediate risk of injury," as "[t]he existence of the statute constitutes the government's commitment to prosecute in accordance with it and, thus, a concrete prospect of future harm for one who would flout it."  *Ibid*.  "Accordingly, when a plaintiff expresses a credible intention to disobey a statute, a sufficient likelihood of injury exists, and a pre-enforcement challenge is appropriate."  *Ibid*.  By contrast, "where the plaintiff seeks relief from

5

Appendix P.26

the defendant's criminal or unconstitutional behavior," or when "a statute was or would have to be misapplied to justify the plaintiff's arrest," "the putative injury typically proves too remote or attenuated to sustain [federal] jurisdiction under Article III." *Ibid*.

The latter situation is exemplified by *Schirmer v. Nagode*, 621 F.3d 581 (7th Cir. 2010). While engaged in a nonviolent protest, the *Schirmer* plaintiffs were arrested and charged with violating a Chicago ordinance providing that a person commits disorderly conduct when he disobeys a police officer's lawful order to disperse where three or more persons are committing acts of disorderly conduct in the immediate vicinity. *Id*. at 582-83. The plaintiffs brought suit, alleging that, at the time of the arrest, neither the plaintiffs nor anybody else in the immediate vicinity were engaged in disorderly conduct, meaning that the arresting officers had "misapplied" the ordinance in arresting them. *Id*. at 583. The plaintiffs sought damages for the violation of their constitutional rights and also brought a facial challenge to the ordinance's constitutionality. *Id*. at 584. To support their standing to bring the facial challenge, the plaintiffs alleged that "they 'plan to continue their participation in constitutionally protected political activities and protests and … fear repeated disruption of these activities and protests and prosecution for them.'" *Ibid*.

The district court held that the plaintiffs had standing, declared the ordinance facially unconstitutional, and enjoined its enforcement. *Ibid*. The Seventh Circuit reversed, holding that although the plaintiffs had standing to pursue a damages claim, they lacked standing to pursue the facial challenge. *Id*. at 588. The Seventh Circuit explained that it was unlikely that "a favorable judicial decision w[ould] prevent or redress [the plaintiffs'] injury" "because the failure-to-disperse provision clearly did not apply to the plaintiffs' actions," as there were "[n]o allegations or facts in the record [to] indicate that three or more individuals were committing acts

Appendix P.27

of disorderly conduct in the plaintiffs' immediate vicinity." *Id*. at 585. The court added that the plaintiffs' "arrests appear to have been baseless, and for that reason, the district court's injunction against enforcement of the provision [was] unlikely to prevent any injury to [them]." *Ibid*. The court allowed that if there "had [been] any indication that the police were even arguably acting within the scope of the failure-to-disperse provision when they arrested plaintiffs, then these plaintiffs could have standing to challenge the facial constitutionality of that provision and to request injunctive relief." *Id*. at 587; *see also Bell*, 697 F.3d at 452 (holding that the plaintiffs in that case had standing to facially challenge the same ordinance because they were arrested for failing to disperse where there *were* three or more persons engaged in disorderly conduct in the immediate vicinity). However, citing the principle that "a plaintiff lacks standing to bring a pre-enforcement challenge if the plaintiff's 'conduct was clearly outside the statute's scope,'" the Seventh Circuit held that the plaintiffs "lacked standing to bring a facial challenge to a law that did not apply by its terms to their desired conduct." *Schirmer*, 621 F.3d at 587.

This case is on all fours with *Schirmer*. Plaintiffs do not allege that David's "mental condition is of such a nature that it poses a clear and present danger to [him], any other person or persons or the community," 430 ILCS 65/8(f), that he wants to keep his FOID card and his firearms despite that condition, and that § 8(f) is preventing him from so doing. If Plaintiffs had alleged that, there would be standing to pursue the facial challenge. *See Bell*, 697 F.3d at 452. To the contrary, the amended complaint alleges that "[t]here [was] no reasonable basis to conclude David Rhein had a mental condition that presented a clear and present danger to himself or anyone else," and that the seizure of Plaintiffs' firearms and the revocation of David's FOID card was "in no way justified under [§ 8(f)]." Doc. 29 at ¶¶ 22-23. That is, Plaintiffs'

Appendix P.28

position is that § 8(f) does not apply by its terms to them and that their condition and conduct fall clearly outside the statute's scope. "Such a clear misuse of [§ 8(f)] does not provide a basis for a federal court to explore that law's facial constitutionality." *Schirmer*, 621 F.3d at 588.

For these reasons, Plaintiffs lack standing to pursue their facial challenge to § 8(f). The challenge accordingly is dismissed, though the dismissal is without prejudice. *See Harris v. Quinn*, 656 F.3d 692, 701 (7th Cir. 2011) ("Generally, when a complaint is dismissed because … the plaintiffs lack standing … it is dismissed without prejudice …."); *Am. Bottom Conservancy v. U.S. Army Corps of Eng'rs*, 650 F.3d 652, 660 (7th Cir. 2011) (where a district court dismisses a suit for lack of standing, "it [has] no jurisdiction [and] therefore [can] only dismiss without prejudice"); *Ramsay v. Mayer*, 420 F. App'x 586, 588 (7th Cir. 2011) ("If plaintiffs indeed lack standing, and there is no jurisdiction, then dismissal must be *without* prejudice; a court cannot adjudicate a claim over which it lacks jurisdiction.").[*]

## II.     Individual Capacity Damages Claims

### A.     First Amendment Claim

Plaintiffs allege that Defendants violated their First Amendment rights when they revoked David's FOID card and seized their firearms because David had "express[ed] unpopular

---

[*] *Schirmer* noted that if there had been "a record [in that case] showing a persistent pattern of similar police misconduct, persons intending to engage in protected speech and expression might be able to show that they were entitled to injunctive relief of some kind, if not against all enforcement of the provision then at least against future such misconduct." 621 F.3d at 588. The amended complaint here alleges "upon information and belief" that § 8(f) "is being used by Illinois State Police officials in a similar and persistent manner against other individuals in Illinois who are having their firearms and/or FOID cards revoked pursuant to this statute for engaging in speech that Illinois State Police officials are falsely construing as an indicative of a mental condition exhibiting dangerousness." Doc. 29 at ¶ 39. However, nowhere in their amended complaint or their opposition brief do Plaintiffs state or even suggest that they are seeking an injunction against the misuse of § 8(f) in that manner; rather, they seek an injunction against any and all enforcement of the statute. *Id*. at p. 6 (seeking "declaratory and injunctive relief against Defendant Grau in that Plaintiffs seek a declaration that 430 ILCS 65/8(f) is unconstitutional, and that Defendants should be temporarily, then permanently, enjoined from enforcing this statute").

Appendix P.29

political views, specifically about his support of Second Amendment rights." Doc. 29 at ¶ 34. To state a viable First Amendment retaliation claim, a plaintiff must allege that: "(1) he engaged in activity protected by the First Amendment; (2) he suffered a deprivation that would likely deter First Amendment activity in the future; and (3) the First Amendment activity was 'at least a motivating factor' in the Defendants' decision to take the retaliatory action." *Bridges v. Gilbert*, 557 F.3d 541, 546 (7th Cir. 2009). The amended complaint plainly alleges all three elements— David's speech about the Second Amendment was protected by the First Amendment, having his FOID card and firearms taken away could deter him from engaging in that speech, and his FOID card and firearms were taken away because Defendants did not like his speech.

Defendants nonetheless argue that "Plaintiffs have pleaded themselves out of court on their First Amendment retaliation claim," Doc. 27 at 16, because they "admit that Mr. Rhein had made perceived threats to a locally elected government official," *id*. at 2, and "admit that Defendants revoked Mr. Rhein's FOID card because they believed that Mr. Rhein possessed a mental condition presenting a clear and present danger," *id*. at 17. But Plaintiffs have admitted no such thing. To the contrary, they allege that "[t]he actions taken against David Rhein … were done because of his political comments to a locally elected official some time before the illegal search and seizure that concerned David Rhein's views about Americans' Second Amendment rights that either the representative, someone in that representative's office, and/or one of the Defendant Officers somehow construed (falsely) as evidence that David Rhein had a mental condition that made him dangerous," Doc. 29 at ¶ 36; that David "was unreasonably deemed mentally unfit based on the exercising of his free speech issues regarding the Second Amendment," Doc. 30 at 16; and that "[w]hile Coffman alleged in his letter that David Rhein had … a mental condition, this is totally without merit, [and] Coffman had no reasonable basis

9

Appendix P.30

for making this conclusion," Doc. 29 at ¶ 31. These allegations are sufficient at this stage of the proceedings to support a claim that Defendants revoked David's FOID card and took away his firearms in retaliation for his protected speech.

**B.     Second Amendment Claim**

Plaintiffs also allege that the revocation of David's FOID card and confiscation of their firearms violated the Second Amendment, which provides an individual right to firearms ownership. *See McDonald v. City of Chicago*, 130 S. Ct. 3020 (2010); *District of Columbia v. Heller*, 554 U.S. 570 (2008). If David indeed had a mental condition of a nature that posed a clear danger to himself or others, then he likely would have suffered no Second Amendment deprivation. *See Heller*, 554 U.S. at 626 (observing that "the right secured by the Second Amendment is not unlimited," and noting that "nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons or the mentally ill"); *Moore v. Madigan*, 702 F.3d 933, 940-41 (7th Cir. 2012) (same); *United States v. Emerson*, 270 F.3d 203, 261 (5th Cir. 2001) ("it is clear that felons, infants and those of unsound mind may be prohibited from possessing firearms"). But Plaintiffs allege that David had no such mental condition and could not reasonably have been thought to have such a condition. Doc. 29 at ¶ 23 ("There [was] no reasonable basis to conclude David Rhein had a mental condition that presented a clear and present danger to himself or anyone else."); *id.* at ¶ 31 (asserting that "Coffman had no reasonable basis for making [the] conclusion" that David had a dangerous mental condition); Doc. 30 at 13 (alleging that David was "falsely labeled as dangerous and mentally incompetent"). Because those allegations are deemed true at the pleading stage, the individual capacity Second Amendment claim survives dismissal.

Appendix P.31

### C.    Fourth Amendment Claim

Plaintiffs allege that their Fourth Amendment rights were violated when "Defendants Pryor and Summers, without a warrant, the Plaintiffs' valid and voluntary consent, or any other legal justification, entered … and illegally searched the Plaintiffs' home, and, once inside, … illegally seized the Plaintiffs' firearms …."  Doc. 29 at ¶ 16.  The entry and search of a home without consent or a warrant presumptively violates the Fourth Amendment.  *See Kentucky v. King*, 131 S. Ct. 1849, 1356 (2011) ("It is a basic principle of Fourth Amendment law … that searches and seizures inside a home without a warrant are presumptively unreasonable.") (internal quotation marks omitted); *Groh v. Ramirez*, 540 U.S. 551, 564 (2004) (characterizing as a "basic rule, well established by [Supreme Court] cases," that "absent consent or exigency, a warrantless search of the home is presumptively unconstitutional").  An exception applies if exigent circumstances are present.  *See Brigham City v. Stuart*, 547 U.S. 398, 403 (2006) ("Warrants are generally required to search a person's home … unless the exigencies of the situation make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment.") (internal quotation marks omitted).  Exigent circumstances may be present if there is a "need to protect or preserve life or avoid serious injury."  *Ibid.*; *see also United States v. Bell*, 500 F.3d 609, 612 (7th Cir. 2007) (holding that exigent circumstances may be present where the police need to "step in to prevent serious injury and restore order").

Defendants contend that there were exigent circumstances here—namely, the "immediate risk of harm" posed by David's "mental state that presented a clear and present danger to himself and others" and his possession of firearms.  Doc. 27 at 14-16; Doc. 34 at 12-13.  But again, Plaintiffs allege that the supposed concern about David's mental condition was a ruse and a

Appendix P.32

pretext to take his FOID card and guns in retaliation for his pro-Second Amendment speech. And even putting aside the allegation, taken as true at this stage, that the individual defendants did not subjectively believe that David's mental condition posed an immediate danger, Defendants must prove that they "had an *objectively* reasonable belief that exigent circumstances existed at the time of their warrantless entry into [Plaintiffs'] residence." *United States v. Fiasche*, 520 F.3d 694, 698 (7th Cir. 2008) (emphasis added); *see also Fitzgerald v. Santoro*, 707 F.3d 725, 731 (7th Cir. 2013) (holding that the defendant officers in a civil suit alleging a Fourth Amendment violation "were required to have an objectively reasonable basis for their belief that exigent circumstances existed" in order to justify their warrantless entry into the plaintiff's home). The amended complaint alleges, plausibly, that any such belief would have been unreasonable, Doc. 29 at ¶ 23, which is sufficient to defeat Defendants' exigent circumstances argument at the pleading stage.

### D.    Due Process Claim

Plaintiffs allege that the revocation of his FOID card and seizure of his firearms violated his right to due process. Doc. 29 at ¶ 20. Defendants' brief does not mention the individual capacity due process claim, let alone seek its dismissal.

### E.    Coffman's Supervisory Liability

Defendants argue that because Plaintiffs failed to adequately plead an underlying Fourth Amendment violation by Agents Pryor and Summers, the supervisory liability claim against Lieutenant Coffman must be dismissed. Doc. 27 at 17-18. Because Plaintiffs have stated a Fourth Amendment claim, Defendants' argument is without merit. No other basis is submitted for dismissing Coffman as a party defendant.

Appendix P.33

**Conclusion**

For the foregoing reasons, Defendants' motion to dismiss is granted in part and denied in part. Plaintiffs' facial challenge to the constitutionality of § 8(f) is dismissed without prejudice for lack of standing. The individual capacity damages claims may proceed. The individual defendants shall answer the surviving portions of the amended complaint by April 10, 2014.

March 20, 2014

_____
United States District Judge

Appendix P.34

IN THE UNITED STATES DISTRICT COURT,
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| DAVID RHEIN, | ) | |
| | ) | No. 13 C 843 |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Hon. Judge Gary Feinerman |
| | ) | |
| LIEUTENANT JOHN COFFMAN, | ) | Hon. Mag. Judge Young B. Kim |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S RESPONSE TO PLAINTIFF'S LOCAL RULE 56.1(a)(3)
STATEMENT OF UNDISPUTED MATERIAL FACTS**

Defendant retired Illinois State Police Lieutenant John Coffman, by his attorney LISA

MADIGAN, Attorney General of Illinois, hereby responds to Plaintiff's Local Rule 56.1(a)(3)

Statement of Undisputed Material Facts as follows:

**Description of the Parties**

1.      At all relevant times pertinent to this occurrence, the Plaintiff, David Rhein, was residing in the Northern District of Illinois, at his home in Sauk Village, Cook County, Illinois. First Am. Compl.¶ 3(Dkt. 29).

**RESPONSE**:  **Defendant admits for purposes of summary judgment.**

2.      At all relevant times pertinent to this occurrence, the Defendant, Illinois State Police Lieutenant John Coffman (hereinafter "Defendant Coffman"), was acting within the scope of his employment with the Illinois State Police, and was acting under color of law. First Am. Compl.  4; Def. Answer  4 (Dkt. 44).

**RESPONSE**:  **Defendant admits for purposes of summary judgment.**

**Plaintiff's Firearms**

3.      The Plaintiff owned several firearms at the time of the events that gave rise to this lawsuit. Ex. A, Pl. Dep. 148-150; First Am. Compl.  ¶10; Def. Answer ¶10; Ex. B, Pl. Affidavit[1]

---

[1]"Ex. B. Pl. Affidavit" refers to Plaintiffs Summary Judgment Exhibit B, which is
Plaintiff David Rhein's

Appendix P.35

¶1.

**RESPONSE**: **Defendant admits for purposes of summary judgment.**

    4.    The Plaintiff used the weapons for hunting and recreation. Ex. A, Pl. Dep. 150-51.

**RESPONSE**: **Dispute. Plaintiff also referenced firearms in the context of making threats to Donna Fanning and the staff of State Representative Anthony DeLuca by writing, "You all need to take a step back and take a look at what you are doing to this state. Befor[e] we the people go Second Amendment on your assess [sic]." (Doc. 67, Ex. F, Fanning Decl., ¶7; Ex. E, Rhein Dep., 75:8-76:19; Ex. H, Pl. Request to Admit, ¶23). During another conversation with Ms. Fanning, Plaintiff stated, "I have never shot anybody in my life, and I never would shoot anyone, unless I am forced to—to protect my constitutional rights." (Doc. 67, Ex. F, Fanning Decl., ¶13; Ex. E, Rhein Dep., 98:17-22). And as Plaintiff left Representative DeLuca's office, Plaintiff stated, "We the people are organizing a militia. I hope the Rep[resentative] is ready for what is coming." (Doc. 67, Ex. F, Fanning Decl., ¶13).**

    5.    The Plaintiff and his wife kept firearms in the home for the purpose of self-defense and he has used at least one of those weapons for self-defense and the defense of his wife in their home. Ex.B, Pl. Affidavit ¶ 1.

**RESPONSE**: **Dispute. Plaintiff also referenced firearms in the context of making threats to Donna Fanning and the staff of State Representative Anthony DeLuca by writing, "You all need to take a step back and take a look at what you are doing to this state. Befor[e] we the people go Second Amendment on your assess [sic]." (Doc. 67, Ex. F, Fanning Decl., ¶7; Ex. E, Rhein Dep., 75:8-76:19; Ex. H, Pl. Request to Admit, ¶23). During another conversation with Ms. Fanning, Plaintiff stated, "I have never shot anybody in my life, and I never would shoot anyone, unless I am forced to—to protect my constitutional rights." (Doc. 67, Ex. F, Fanning Decl., ¶13; Ex. E, Rhein Dep., 98:17-22). And as Plaintiff left Representative**

2

DeLuca's office, Plaintiff stated, "We the people are organizing a militia. I hope the Rep[resentative] is ready for what is coming." (Doc. 67, Ex. F, Fanning Decl., ¶13).

### Plaintiff's Political Beliefs

6.    The Plaintiff believes that counties have no right to collect any taxes (Ex. A, Pl. Dep. 19-21), and specifically that Cook County has no right to collect property taxes (Ex. A, Pl. Dep. 64-65).

**RESPONSE**:  **Defendant admits for purposes of summary judgment.**

7.    He believes the state and federal governments "keep each other in check." Ex. A, Pl. Dep. 55.

**RESPONSE**:  **Defendant admits for purposes of summary judgment.**

8.    The Plaintiff has never been a member of a group that describes itself as a militia. Ex. A, Pl. Dep. 94.

**RESPONSE**:  **Dispute. As Plaintiff left Representative DeLuca's office in January 2011, he admitted to Ms. Fanning that, "We the people are organizing a militia. I hope the Rep[resentative] is ready for what is coming." (Doc. 67, Ex. F, Fanning Decl., ¶13).** *See also* **(Doc. 68, ¶20, Pl. Statement of Undisputed Facts).**

### Contact with Representative Anthony DeLuca's Offices

#### March 10, 2010

9.    On March 10, 2010, the Plaintiff went to Representative Anthony DeLuca's ("Representative DeLuca") office in Springfield to drop off a packet of documents. Ex. A, Pl. Dep. 14; Ex. C, Def. Coffman Dep. Group Ex. No. 3, AGO Bates No. 5, 46. [2]

**RESPONSE**:  **Defendant admits for purposes of summary judgment.**

10.    On March 22, 2010, the Plaintiff called Donna Fanning ("Fanning") at Representative DeLuca's Crete office to see if he could leave a copy of the same documents that

---

[2]"Def. Coffman Dep. Group Ex. No. 3" refers to Group Exhibit Number 3 from Defendant Coffman's Deposition, and "AGO Bates No." refers to the Attorney General's Bates Stamp Numbering.

Appendix P.37

he provided to the Springfield office, and the Plaintiff later came to the office and slipped them under the door. Ex. A, Pl. Dep. 25-26; Ex. C, Def. Coffman Dep. Group Ex. No. 3, AGO Bates No. 5, 46.

**RESPONSE**:  **Defendant admits for purposes of summary judgment.**

11.  Fanning alleges that on this date, the Plaintiff stated, "I am ready to start shooting people" over the phone. Ex. C, Def. Coffman Dep. Group Ex. No. 3, AGO Bates No. 5, 46.

**RESPONSE**:  **Defendant admits for purposes of summary judgment.**

12.  However, Fanning also conceded the "[c]onversation ended peacefully." Id.

**RESPONSE**:  **Defendant admits for purposes of summary judgment.**

<u>August 3, 2010</u>

13.  On August 3, 2010, the Plaintiff dropped off another packet and Fanning contacted the Crete Police Department regarding the Plaintiff. Ex. C, Def. Coffman Dep. Group Ex. No. 3, AGO Bates No. 5, 46.

**RESPONSE**:  **Defendant admits for purposes of summary judgment.**

14.  She turned over the packet of documents that the Plaintiff left to Crete Police Department Detective Sergeant Robert Hill. Id.

**RESPONSE**:  **Defendant admits for purposes of summary judgment.**

<u>September 30, 2010</u>

15.  On September 30, 2010, the Plaintiff allegedly called Representative DeLuca's office, yelled at Fanning and hung up the phone. Id.

**RESPONSE**:  **Defendant admits for purposes of summary judgment.**

<u>January 14, 2011</u>

16.  On January 14, 2011, the Plaintiff allegedly called Representative DeLuca's office and said he was coming in to the district office. Ex. C, Coffman Dep. Group Ex. No. 3, AGO Bates No. 6, 47.

**RESPONSE**:  **Defendant admits for purposes of summary judgment.**

17.  Fanning called the Crete Police Department and left a message for Detective Hill, but the Crete Police Department did not return her call or follow up with her. Id.

Appendix P.38

**RESPONSE**:  **Defendant admits for purposes of summary judgment.**

18.    The Plaintiff arrived, "handed [Fanning] a packet," and then "left without incident." Id.

**RESPONSE**:  **Dispute. Plaintiff did not leave "without incident." The packet that Plaintiff left with Ms. Fanning stated on the outside, "WHATS IN THIS ENEVELOPE ARE FACTS NOT FICTION," "LEARN TO READ THE TRUTH THE WHOLE TRUTH AND NOTHING BUT THE TRUTH SO HELP YOU (GOD)," "IT ALSO EXPLAINS WHY THERE ARE SO MANY FATASS & LAZYASS PEOPLE IN THIS COUNTRY AND STATE," "1812 – 2012?," "WHAT MITE THESE TWO DATES HAVE IN COMMON?" "NEED A HINT." (Doc. 67, Ex. F, Fanning Decl., ¶5; Ex. E, Rhein Dep., 35:13-17, 92:21-93:6; Ex. H, Pl. Request to Admit, ¶18). Inside the packet were various documents, including excerpts of the Declaration of Independence, the Constitution, and a biography of the Illinois Attorney General—Lisa Madigan. (Ex. F, Fanning Decl., ¶6). Plaintiff wrote, "Now you know why so many of your people or [sic] going to be shot because your [sic] too selfish too [sic] understand the truth." (Ex. F, Fanning Decl., ¶6; Ex. H, Pl. Request to Admit, ¶21). He also wrote, "Constitutional Convention—Artical [sic] XII State Second Amendment Fed Now you know why you may be next." (Doc. 67, Ex. F, Fanning Decl., ¶6; Ex. E, Rhein Dep., 69:10-12; Ex. H, Pl. Request to Admit, ¶22). Below this was a drawing of a crosshairs (a circle with a cross in the middle). (Doc. 67, Ex. F, Fanning Decl., ¶6; Ex. E, Rhein Dep., 74:22-75:1; Ex. G, Boggs Dep., 41:7-42:10). Within this packet also included a document on which Plaintiff wrote, "You all need to take a step back and take a look at what you are doing to this state. Befor[e] we the people go Second Amendment on your**

Appendix P.39

assess [sic]." (Ex. F, Fanning Decl., ¶7; Ex. E, Rhein Dep., 75:8-76:19; Ex. H, Pl. Request to

Admit, ¶23).

January 25, 2011

19.     On January 25, 2011, the Plaintiff allegedly called Fanning and made various statements, including telling her he was "getting angry" because Representative DeLuca called the Plaintiff and "blew smoke up [Plaintiff's] rear end" and "ignored [Plaintiff's] petition." Ex. C, Def. Coffman Dep. Group Ex. No. 3, AGO Bates No. 67.

**RESPONSE**:  **Defendant admits for purposes of summary judgment.**

20.     The Plaintiff also allegedly stated, "I am not a violent person" and "I am a member of the Illinois State Militia." Id.

**RESPONSE**:  **Defendant admits for purposes of summary judgment.**

21.     Fanning "told [the Plaintiff] that his writings do not ask a specific question, and they are threatening and disrespectful" and that "he needs to rewrite them to ask specific questions in a respectful way that makes sense." Ex. C, Def. Coffman Dep. Group Ex. No. 3, AGO Bates No. 68.

**RESPONSE**:  **Defendant admits for purposes of summary judgment.**

22.     The Plaintiff replied that "he would like to come to the office and discuss what changes should be made to his letters to make them more civil so he can get an answer." Id.

**RESPONSE**:  **Defendant admits for purposes of summary judgment.**

23.     Fanning also alleged that the Plaintiff told her he called the Governor and "threatened to kick his ass'" because he would not answer his calls. Id.

**RESPONSE**:  **Defendant admits for purposes of summary judgment.**

24.     Shortly thereafter, the Plaintiff arrived at Representative DeLuca's office and spoke to Fanning for about an hour and presented her with a copy of the original packet he gave Representative DeLuca's secretary in Springfield on March 10, 2010, containing pages that had previously been received on March 3, 2010 and/or August 3, 2010. Ex. C, Def. Coffman Dep. Group Ex. No. 3, AGO Bates No. 35-38, 68.

**RESPONSE**:  **Dispute. Plaintiff gave Ms. Fanning different documents in January 2011**

**from the ones he gave her in August 2010. (Doc. 67, Ex. F, Fanning Decl., Exs. A-B).**

Appendix P.40

25.     According to Fanning, during this encounter, the Plaintiff "referred to himself as a 'sacrifice lamb'" several times and "kept speaking about 2012 as a year of great significance, of revolution and overthrowing the government and we the people taking it back." Ex. C, Def. Coffman Dep. Group Ex. No. 3, AGO Bates No. 68-69.

**RESPONSE**: **Defendant admits for purposes of summary judgment.**

26.     The Plaintiff also allegedly stated he had "never shot anybody in [his] life, and [he] never would shoot anyone, unless [he] is forced to -to protect [his] constitutional rights." Ex. C, Def. Coffman Dep. Group Ex. No. 3, AGO Bates No. 69.

**RESPONSE**: **Defendant admits for purposes of summary judgment.**

<u>February 1, 2011</u>

27.     The last contact with Representative DeLuca's office listed on Fanning's timeline was on February 1, 2011, when the Plaintiff spoke to her over the phone. Ex. C, Def. Coffman Dep. Group Ex. No. 3, AGO Bates No. 10.

**RESPONSE**: **Defendant admits for purposes of summary judgment.**

28.     Plaintiff allegedly told Fanning he would "picket [their] parking lot with a group of people who want answers" and that he "cannot understand why the Rep. [sic] won't answer his petition in writing, as many times as he has respectfully asked for answers to his questions." Ex. C, Def. Coffman Dep.Group Ex. No. 3, AGO Bates No. 51.

**RESPONSE**: **Defendant admits for purposes of summary judgment.**

29.     At no point in Fanning's narrative of the interaction on this date is there any mention of threats made by the Plaintiff. Ex. C, Def. Coffman Dep. Group Ex. No. 3, AGO Bates No. 51.

**RESPONSE**: **Dispute. Plaintiff stated that if Representative DeLuca cannot answer his questions, "SOMEONE IS GOING TO!" (Doc. 67, Ex. F, Fanning Decl., Ex. C, p. AGO 000010).**

<u>The Packages</u>

30.     Between March 10, 2010 and January 25, 2011, the Plaintiff visited Representative DeLuca's offices approximately four times and delivered a packet of documents each time; Plaintiff delivered one package of documents to Representative DeLuca's Springfield office and three to his Crete office. Ex. A, Pl. Dep. 14, 18, 25, 28, 35-36; Ex. C, Coffman Dep. Group Ex. No. 3, AGO Bates No. 46-50.

Appendix P.41

**RESPONSE**: **Defendant admits for purposes of summary judgment.**

31.     All four packets were exactly the same except for the last one, where, according to Plaintiff, he included the Declaration of Independence. Ex. A, Pl. Dep. 28.

**RESPONSE**: **Dispute. Plaintiff tendered different documents in August 2010 from the documents he tendered in January 2011. (Doc. 67, Ex. F, Fanning Decl., Exs. A-B).**

32.     These packets were also sent to the Governor, Representative Jesse Jackson, and every representative in the federal government from Illinois. Ex. A, Pl. Dep. 100.

**RESPONSE**: **Defendant admits for purposes of summary judgment.**

<b>The Revocation</b>

33.     The first time the Plaintiff was contacted by the police regarding his contacts with Representative DeLuca's office was the day his home was raided in February 2011. Ex. A, Pl. Dep. 121-22.

**RESPONSE**: **Dispute. Plaintiff's house was not raided; Plaintiff voluntarily allowed ISP officers to enter his home and take his firearms. (Coffman Dep., 44:21-46:3, attached hereto as Exhibit A).**

34.     On February 2, 2011, based solely on information from Fanning, the Statewide Terrorism and Intelligence Center ("STIC") assessed the Plaintiff's alleged threats, (Ex. D, Summers Dep. 16-17), and STIC determined that Plaintiff made "inappropriate contact or communication and/or interest in a public official without the apparent immediate capability to commit and act of harm or targeted violence at this time." Ex. C, Def. Coffman Dep. Group Ex. No. 3, AGO Bates No.3.

**RESPONSE**: **Dispute. ISP's Statewide Terrorism and Intelligence Center was also contacted by the Crete Police Department. (Doc. 67, Ex. F, Fanning Decl., ¶14).**

35.     Further, STIC determined that the Plaintiff's communications expressed views "typical of a Sovereign Citizen ideology." Id.

**RESPONSE**: **Defendant admits for purposes of summary judgment.**

36.     STIC noted that on March 22, 2010, the Plaintiff was alleged to have said, "I am

Appendix P.42

ready to start shooting people," and that on January 25, 2011, the Plaintiff allegedly told Fanning that he had called the governor and "threatened to 'kick his ass.'" Ex. C, Def. Coffman Group Ex. No. 3, AGO Bates No. 3-4, 11, 57, 59.

**RESPONSE**: **Defendant admits for purposes of summary judgment.**

37.    On February 3, 2011, Defendant Coffman signed a letter to the Plaintiff advising him that his FOID card had been revoked pursuant to 430 ILCS 65/8(f) because the Plaintiff allegedly "possessed a mental condition that presented a clear and present danger." Def. Answer ¶ 13-15, 21, 31.

**RESPONSE**: **Defendant admits for purposes of summary judgment.**

38.    On or before February 4, 2011, the letter was placed into the U.S. Mail. Def. Answer ¶ 13.

**RESPONSE**: **Defendant admits for purposes of summary judgment.**

39.    On February 3, 2011, Illinois State Police Agents Steven Pryor ("Agent Pryor") and Freddie Summers ("Agent Summers") met at the Sauk Village Police Department. Ex. E, Pryor Dep. 14; Ex. D, Summers Dep. 18.

**RESPONSE**: **Defendant admits for purposes of summary judgment.**

40.    Their plan was to interview the Plaintiff and ask him "to explain what he meant by his correspondence with DeLuca." Ex. D, Summers Dep. 21.

**RESPONSE**: **Defendant admits for purposes of summary judgment.**

41.    On February 4, 2011, Officer Vela of the Sauk Village Police Department came to the Plaintiff's home and told him that the Illinois State Police were at the police station. Ex. A, Pl. Dep. 122-23.[3]

**RESPONSE**: **Defendant admits for purposes of summary judgment.**

42.    The Plaintiff then went to the Sauk Village Police Department with Officer Vela and met with Agent Pryor and Agent Summers. Ex. A, Pl. Dep. 123.

**RESPONSE**: **Defendant admits for purposes of summary judgment.**

---

[3]The Plaintiff testified at his deposition that this happened on February 5, 2011. Ex. A, Pl. Dep. 123. However, for the purposes of this motion, and viewing the facts in the light most favorable to the non-moving party, Defendant Coffman, we are accepting Agent Steven Pryor's recollection that these events happened on February 4, 2011.

Appendix P.43

<u>Plaintiff's Interview with Agent Pryor and Agent Summers</u>

43.     Agent Pryor informed the Plaintiff his FOID card was revoked and he was told to surrender his guns, which the Plaintiff did. Ex. A, Pl. Dep. 126, 128.

**<u>RESPONSE</u>**:  **Defendant admits for purposes of summary judgment.**

44.     On February 4, 2011, when the Plaintiff was interviewed by Agent Pryor and Agent Summers, the FOID revocation letter had already been drafted signed, and the Plaintiff's FOID card had already been revoked. Ex. E, Pryor Dep. 24-25.[4]

**<u>RESPONSE</u>**:  **Defendant admits for purposes of summary judgment.**

45.     The Plaintiff told Agent Summers that he wanted to get people's attention and he knew by making those kinds of comments he would accomplish that. Ex. D, Summers Dep. 30; Ex. C, Def. Coffman Dep. Group Ex. No. 3, AGO Bates No. 32-34.

**<u>RESPONSE</u>**:  **Defendant admits for purposes of summary judgment.**

46.     The Plaintiff told Agent Summers he was prepared to run against Representative DeLuca in the next election if Representative DeLuca did not respond to him, and that he had no plans of inflicting any kind of violence toward Representative DeLuca. Ex. D, Summers Dep. 31.

**<u>RESPONSE</u>**:  **Defendant admits for purposes of summary judgment.**

47.     Throughout the interview, Agent Summers observed the Plaintiff to be calm; he was not acting in an irrational matter and had a normal conversation with Agent Summers. Ex. D, Summers Dep. 31; Ex. C, Def. Coffman Dep. Group Ex. No. 3, AGO Bates No. 32-34. According to Agent Summers, the Plaintiff was cooperative and did not seem angry or upset. Ex. D, Summers Dep. 52.

**<u>RESPONSE</u>**:  **Defendant admits for purposes of summary judgment.**

48.     Agent Summers does not recall whether he or Agent Pryor asked the Plaintiff about any history of mental disease, but the Plaintiff did not appear to Agent Summers to be someone who suffered from mental illness. Ex. D, Summers Dep. 31-32.

---

[4]Plaintiff believes that the interview and seizure of his weapons took place on Saturday, February 5, 2011. Ex. A, Pl. Dep. 123, 131. However, for the purposes of this motion, we are viewing the facts in the light most favorable to Defendant Coffman and are accepting the February 4, 2011 date that Agent Pryor testified to at his deposition. Plaintiff denies seeing the revocation letter at the meeting with Agent Pryor and Agent Summers (Ex. A, Pl. Dep. 136), however, for the purposes of this motion only, the Plaintiff is accepting the facts most favorable to Defendant Coffman.

Appendix P.44

**RESPONSE**: **Defendant admits for purposes of summary judgment.**

49.     Agent Summers did not feel he had probable cause to arrest the Plaintiff for any criminal offense at any time during his investigation. Ex. D, Summers Dep. 67.

**RESPONSE**:  **Defendant admits for purposes of summary judgment.**

50.     According to Agent Summers, the extent of his investigation of the threat was to interview the Plaintiff and review the documents that the Plaintiff sent to Representative DeLuca's office. Ex. D, Summers Dep. 52.

**RESPONSE**:  **Defendant admits for purposes of summary judgment.**

51.     Agent Summers believes he spoke to Fanning on the phone "at some point" but is "unsure of the exact date" and it could have been "before or after" his interview with the Plaintiff or "possibly even both" before and after; this possible telephone conversation is not reflected in any documents. Ex. D, Summers Dep. 53.

**RESPONSE**:  **Defendant admits for purposes of summary judgment.**

52.     Agent Summers is unsure if he ever spoke with Representative DeLuca. Ex. D, Summers Dep. 62.

**RESPONSE**:  **Defendant admits for purposes of summary judgment.**

53.     Agent Pryor testified at deposition that he "believe[s] [he] knew ahead of the interview that [the Plaintiff's] FOID privileges had been revoked. . ." Ex. E, Pryor Dep. 36.

**RESPONSE**:  **Defendant admits for purposes of summary judgment.**

54.     Agent Pryor testified that during the interview, the Plaintiff was "calm" and "spoke passionately" but did not say anything for which he could be arrested, nor did he say anything to make Agent Pryor believe he may need to "order an ambulance" to take the Plaintiff to the "mental ward." Ex. E, Pryor Dep. 47-48.

**RESPONSE**:  **Defendant admits for purposes of summary judgment.**

55.     Agent Pryor testified that based on what the Plaintiff did, said and wrote, in the totality of his investigation, there was no probable cause to arrest the Plaintiff for any offense prior to taking the Plaintiff's weapons. Ex. E, Pryor Dep. 72.

**RESPONSE**:  **Defendant admits for purposes of summary judgment.**

56.     Nothing in Agent Pryor's interaction with the Plaintiff on February 4th, 2011 led Agent Pryor to believe that the Plaintiff had any kind of mental illness. Ex. E, Pryor Dep. 48.

Appendix P.45

**RESPONSE**: **Dispute. Agent Pryor had relayed to Defendant information consisting of threats made by Plaintiff that evidenced his mental condition. (Doc. 67, Ex. A, Coffman Dep., 54:6-14; Ex. D, Email of Steven Pryor, 2/3/11; Ex. C, Pryor Dep., 67:11-68:3).**

57. Nothing about the Plaintiff's behavior on February 4, 2011, would have led Agent Pryor to believe that the Plaintiff was a clear and present danger to anyone. Ex. E, Pryor Dep.

**RESPONSE**: **Dispute. Agent Pryor had relayed to Defendant information consisting of threats made by Plaintiff that evidenced his mental condition. (Doc. 67, Ex. A, Coffman Dep., 54:6-14; Ex. D, Email of Steven Pryor, 2/3/11; Ex. C, Pryor Dep., 67:11-68:3).**

58. No matter what the Plaintiff told them during the interview, it would not have mattered because the Plaintiff's FOID card had already been revoked. Ex. E, Pryor Dep. 41.

**RESPONSE**: **Defendant admits for purposes of summary judgment.**

59. After the interview, the police and Agent Pryor entered the Plaintiff's home and seized Plaintiff's firearms. Ex. A, Pl. Dep. 101,129-30.

**RESPONSE**: **Defendant admits for purposes of summary judgment.**

60. The Plaintiff received the FOID card revocation letter in the mail on Monday, February 7, 2011. Ex. A, Pl. Dep. 136.

**RESPONSE**: **Dispute. Agent Pryor disclosed the FOID card letter to Plaintiff on the date of the interview with Plaintiff, either February 4 or 5, 2011. (Pryor Dep., 25:3-25:13, attached as Exhibit B).**

**Plaintiff's Immediate Attempts to Reinstate his FOID Card and Retrieve His Guns**

61. According to Agent Summers, the same day that the Plaintiff had his weapons taken, the Plaintiff asked Agent Pryor how to retrieve them. Ex. D, Summers Dep. 51.

**RESPONSE**: **Defendant admits for purposes of summary judgment.**

62. Agent Pryor told the Plaintiff the process for getting his guns back was at the bottom of the FOID revocation letter. Ex. E, Pryor Dep. 60.

Appendix P.46

**RESPONSE**: **Defendant admits for purposes of summary judgment.**

63.     Agent Pryor told the Plaintiff, "there is a phone number to call," and explained that "there is an initial paragraph as to the steps [the Plaintiff] needed to take to get. . . a new FOID card issued to him." Ex. E, Pryor Dep. 60; Ex. C, Def. Coffman Group Ex. No. 3; AGO Bates No. 71.

**RESPONSE**: **Defendant admits for purposes of summary judgment.**

64.     The Plaintiff immediately tried to find a psychiatrist, but had difficulty finding one that would agree to evaluate him, and several months passed before he finally succeeded. Ex. A, Pl. Dep. 157-58.

**RESPONSE**: **Defendant admits for purposes of summary judgment.**

65.     Sometime between August 2011 and September 2011, the Plaintiff hired an attorney to assist him. Id.

**RESPONSE**: **Defendant admits for purposes of summary judgment.**

### Defendant Coffman's Revocation Appeal Procedures

66.     Defendant Coffman was the chief of the Illinois State Police Firearms Services Bureau, charged with deciding on and processing FOID card revocations. Ex. F, Def. Coffman Dep. 29, 30-31.

**RESPONSE**: **Defendant admits for purposes of summary judgment that he was employed as Chief of the Firearms Services Bureau until February 2012.**

67.     Agent Summers never gave his report regarding his interview with the Plaintiff to the Firearms Services Bureau and never spoke to anyone there at any time during his investigation of the Plaintiff's case. Ex. D, Summers Dep. 56.

**RESPONSE**: **Defendant admits for purposes of summary judgment.**

68.     Agent Pryor may have had a conversation with Defendant Coffman on February 3, 2011 and potentially February 4, 2011, however, Agent Pryor does not remember having interaction with Defendant Coffman anytime after the Plaintiff's interview. Ex. E, Pryor Dep. 60-61.

**RESPONSE**: **Defendant admits for purposes of summary judgment.**

69.     The Illinois State Police has no written directives or policies regarding revocation of FOID Card; it solely relies on the statutory language of the FOID Card Act. Ex. F, Def. Coffman Dep. 22; Ex. G, Def. Coffman's Answers to Pl. Interrog., Interrog. No. 8-9.

13

Appendix P.47

**RESPONSE**:  **Defendant admits for purposes of summary judgment.**

70.     As a matter of policy, Defendant Coffman does not interview clear and present danger revokees prior to revocation of their FOID cards. Ex. F, Def. Coffman Dep. 64.

**RESPONSE**:  **Dispute. Due to the urgent nature of a revocation of a FOID card pursuant to the clear and present danger standard of section 8(f) of the FOID Card Act, it is a matter of ISP policy for Defendant to not interview potential revokees prior to revocation. (Doc. 67, Ex. A, Coffman Dep., 64:18-23). However, ISP Zone Agents are in charge of interviewing potential revokees and witnesses, and Defendant may rely upon their investigations in making the decision to revoke a FOID card. (Doc. 67. Ex. A, Coffman Dep., 64:24-65:9).**

71.     Defendant Coffman approves revocations based on summaries done by zone investigators and the State Terrorism Intelligence Center. Ex. F, Def. Coffman Dep. 67, 68-69, 72-73.

**RESPONSE**:  **Defendant admits for purposes of summary judgment.**

72.     Defendant Coffman approved revocation of the Plaintiff's FOID card and signed the letter sent to the Plaintiff informing him of the revocation. Ex. F, Def. Coffman Dep. 19; Ex. C, Def. Coffman Dep. Group Ex. No. 3, AGO Bates No. 71; Def. Answer 12.

**RESPONSE**:  **Defendant admits for purposes of summary judgment.**

73.     The Plaintiff's revocation was based on a summary of what other people said he did. Ex. F, Def. Coffman Dep. 124.

**RESPONSE**:  **Defendant admits for purposes of summary judgment.**

74.     The standard revocation letter, the one that the Plaintiff received, instructs revokees to contact FOID program personnel in Defendant Coffman's unit, the Firearm [sic] Services Bureau; revokees are not instructed to contact the legal unit. Ex. F, Def. Coffman Dep. 114-15; Ex. C, Def. Coffman Group Ex. No. 3, AGO Bates No. 71.

**RESPONSE**:  **Defendant admits for purposes of summary judgment.**

75.     The standard revocation letter also strongly encourages revokees to obtain "letter of recommendation from the police department or sheriff's office who handled [Plaintiff's] incident," a "letter from a psychiatrist. . . attesting to [Plaintiff's suitability to acquire, possess,

Appendix P.48

and use firearms," and "[t]hree or more letters of character reference . . ." Ex. C, Def. Coffman Group Ex. No. 3, AGO Bates No. 71.

**RESPONSE**: **Defendant admits for purposes of summary judgment.**

76.     Given issues of exposing oneself to legal liability, Defendant Coffman acknowledged that complying with the requests outlined in the revocation letter may mean that a revokee may have to contact "six, seven, eight, nine, ten different doctors before they find somebody that's going to indicate they are suitable." Ex. F, Def. Coffman Dep. 123.

**RESPONSE**: **Defendant admits for purposes of summary judgment.**

77.     Defendant Coffman did not provide a psychiatrist or psychologist through the Firearm [sic] Services Bureau because of the financial burden it would place on the State; instead Coffman places this burden on the revokee. Id.

**RESPONSE**: **Defendant admits for purposes of summary judgment.**

78.     In order for a revokee to receive a hearing, he or she must return the information requested in the revocation letter to Defendant Coffman's Unit, and, if Defendant Coffman's unit believes that the requests were complied with, the information is forwarded to the legal department in order to provide a hearing. Ex. F, Def. Coffman Dep. 115-16.

**RESPONSE**: **Dispute. If an applicant seeking reinstatement of a FOID card requests an in-person hearing, he or she is directed to contact the Bureau of Firearms Services and provide all of the requested information; the Bureau of Firearms Services will then compile any additional information from the objecting/complaining party, as well as from local law enforcement and ISP Zone Agents, and forward all of these materials to ISP's legal department. (Doc. 67, Ex. A, Coffman Dep., 115:1-116:10). ISP's in-house legal department ultimately makes the final decision as to whether an applicant is entitled to an in-person hearing, but only after it considers all relevant documents provided by ISP's Bureau of Firearms Services. (Doc. 67, Ex. A, Coffman Dep., 111:14-20, 116:11-19). If an applicant is unable to obtain all three forms of documents, he or she still may be entitled to an in-**

Appendix P.49

**person hearing if requested depending on the reasons why all of the requested**

**documentation was not provided. (Doc. 67, Ex. A, Coffman Dep., 129:3-130:4).**

79.     It could be months or years before a hearing is provided to a revokee. Ex. F, Def. Coffman Dep. 127-28.

**RESPONSE**: **Defendant admits for purposes of summary judgment.**

80.     The right to an in-person hearing is not an absolute. Ex. F, Def. Coffman Dep. 130.

**RESPONSE**: **Dispute. Defendant is unaware of any instance in which an applicant who had**

**a FOID card revoked under the clear and present danger standard was denied a request**

**for a FOID card reinstatement hearing by ISP. (Doc. 67, Ex. A, Coffman Dep., 126:22-24).**

**If a hearing under such circumstances is requested, one will be provided. (Doc. 67, Ex. A,**

**Coffman Dep., 127:10-11).**

### Plaintiff's Attorney's Correspondence with Defendant Coffman

81.     On August 8, 2011, Defendant Coffman received a letter dated August 1, 2011 from the Plaintiff's attorney, Joseph Barbaro, formally requesting reinstatement the Plaintiff's FOID card. Ex. F, Def. Coffman Dep. 137, 139; Ex. C, Def. Coffman Group Ex. No. 3, AGO Bates Stamp No. 79, 81-83.

**RESPONSE**: **Defendant objects and moves to strike this paragraph on the ground that it**

**exceeds the number of facts (80) allowable under Local Rule 56.1 without leave of court.**

**Subject to and without waiving said objection, Defendant disputes. The first time that**

**Defendant became aware that Plaintiff sought reinstatement of his FOID card was when**

**Defendant saw a letter to that effect from Plaintiff's attorney, Joseph Barbaro, on**

**September 23, 2011. (Doc. 67, Ex. A, Coffman Dep., 133:19-135:18).**

82.     Attorney Barbaro's letter included Dr. Alan Childs' psychological report and three letters of character reference. Id.

**RESPONSE**: **Defendant objects and moves to strike this paragraph on the ground that it**

16

Appendix P.50

exceeds the number of facts (80) allowable under Local Rule 56.1 without leave of court.

Subject to and without waiving said objection, Defendant admits for purposes of summary

judgment.

83.    Dr. Alan Childs' report stated, "it is my professional and clinical opinion that [the Plaintiff] does not present as an individual that is dangerous to himself or others." Ex. C, Def. Coffman Group Ex. No. 3, AGO Bates Stamp No. 77.

**RESPONSE**:  **Defendant objects and moves to strike this paragraph on the ground that it**

**exceeds the number of facts (80) allowable under Local Rule 56.1 without leave of court.**

**Subject to and without waiving said objection, Defendant admits for purposes of summary**

**judgment.**

84.    On September 23, 2011, Defendant Coffman received a letter dated September 19th, 2011 from the Plaintiff's attorney requesting a response to his previous letter. Ex. F, Def. Coffman Dep. 135; Ex. C, Def. Coffman Group Exhibit No. 3, AGO Bates Stamp No. 84.

**RESPONSE**:  **Defendant objects and moves to strike this paragraph on the ground that it**

**exceeds the number of facts (80) allowable under Local Rule 56.1 without leave of court.**

**Subject to and without waiving said objection, Defendant disputes. The first time that**

**Defendant became aware that Plaintiff sought reinstatement of his FOID card was when**

**Defendant saw a letter to that effect from Plaintiff's attorney, Joseph Barbaro, on**

**September 23, 2011. (Doc. 67, Ex. A, Coffman Dep., 133:19-135:18).**

85.    On January 24, 2012, Defendant Coffman received a letter from Attorney Barbaro that was addressed to Director Hiram Grau and dated January 16, 2011. Ex. F, Def. Coffman Dep. 143-44;Ex. C, Def. Coffman Group Ex. No. 3, AGO Bates Stamp No. 87.

**RESPONSE**:  **Defendant objects and moves to strike this paragraph on the ground that it**

**exceeds the number of facts (80) allowable under Local Rule 56.1 without leave of court.**

**Subject to and without waiving said objection, Defendant admits for purposes of summary**

**judgment.**

86. Defendant Coffman did not read the psychological report attached to that letter. Ex. F, Def. Coffman Dep. 136.

**RESPONSE**: **Defendant objects and moves to strike this paragraph on the ground that it exceeds the number of facts (80) allowable under Local Rule 56.1 without leave of court. Subject to and without waiving said objection, Defendant admits for purposes of summary judgment.**

87. Defendant Coffman did not interpret the Plaintiff's attorney's letter as a formal request for a hearing. Ex. F, Def. Coffman Dep. 140.

**RESPONSE**: **Defendant objects and moves to strike this paragraph on the ground that it exceeds the number of facts (80) allowable under Local Rule 56.1 without leave of court. Subject to and without waiving said objection, Defendant admits for purposes of summary judgment.**

88. However, there was no notice provided to the Plaintiff or his attorney in that letter that he had to use the word "hearing" versus "reinstatement." Ex. F, Def. Coffman Dep. 141.

**RESPONSE**: **Defendant objects and moves to strike this paragraph on the ground that it exceeds the number of facts (80) allowable under Local Rule 56.1 without leave of court. Subject to and without waiving said objection, Defendant disputes. Defendant explained that regardless of whether Plaintiff's attorney used the word "hearing" versus "reinstatement," a totality of the circumstances test would be used to determine whether the reinstatement process would involve a document review, or a formal hearing. (Coffman Dep., 141:20-142:7, attached hereto as Exhibit A).**

89. Additionally, the FOID Card Act statute that governs FOID Card reinstatements makes no distinctions between requests for a hearing or requests of reinstatement of a revokee's FOID Card. 430 ILCS 65/10(a).

**RESPONSE**: **Defendant objects and moves to strike this paragraph on the ground that it**

Appendix P.52

**exceeds the number of facts (80) allowable under Local Rule 56.1 without leave of court**

**and that this paragraph states a legal conclusion as opposed to a fact. Subject to and**

**without waiving said objections, Defendant admits that the 430 ILCS 65/10(a) does not**

**define a request for reinstatement or a request for a hearing.**

90.    The psychological report was probably placed in the Plaintiff's file since the Plaintiff supposedly did not request a hearing, but rather supposedly requested "reinstatement," which Defendant Coffman considered a request for a document review. Ex. F, Def.Coffman Dep. 136.

**RESPONSE**:  **Defendant objects and moves to strike this paragraph on the ground that it**

**exceeds the number of facts (80) allowable under Local Rule 56.1 without leave of court.**

**Subject to and without waiving said objection, Defendant admits for purposes of summary**

**judgment.**


91.    Other than getting a letter or some sort of approval from the police involved in the case, Plaintiff did everything that Defendant Coffman asked of him. Ex. F, Def.Coffman Dep. 140.

**RESPONSE**:  **Defendant objects and moves to strike this paragraph on the ground that it**

**exceeds the number of facts (80) allowable under Local Rule 56.1 without leave of court.**

**Subject to and without waiving said objection, Defendant admits for purposes of summary**

**judgment.**


92.    Defendant Coffman did not respond to any of Plaintiff's attorney's letters, despite receiving all of them. Ex. F, Def. Coffman Dep. 142.

**RESPONSE**:  **Defendant objects and moves to strike this paragraph on the ground that it**

**exceeds the number of facts (80) allowable under Local Rule 56.1 without leave of court.**

**Subject to and without waiving said objection, Defendant disputes. The citation provided**

**by Plaintiff states only that Defendant received one letter from Plaintiff's attorney on**

Appendix P.53

September 23, 2011.

93.    Regardless of whether any of Attorney Barbaro's letters requested a "hearing, "one might not have been provided anyway. Ex. F, Def. Coffman Dep. 142.

**RESPONSE**: **Defendant objects and moves to strike this paragraph on the ground that it exceeds the number of facts (80) allowable under Local Rule 56.1 without leave of court. Subject to and without waiving said objection, Defendant disputes. Defendant is unaware of any instance in which an applicant who had a FOID card revoked under the clear and present danger standard was denied a request for a FOID card reinstatement hearing by ISP. (Doc. 67, Ex. A, Coffman Dep., 126:22-24). If a hearing under such circumstances is requested, one will be provided. (Doc. 67, Ex. A, Coffman Dep., 127:10-11).**

94.    On January 24, 2012, a memorandum regarding the Plaintiff's "request for a hearing" was sent from Colonel Patrick E. Keen to the Firearms Services Bureau, Defendant Coffman's unit. Ex. C, Def. Coffman Group Ex. No. 3, AGO Bates Stamp No. 87.

**RESPONSE**: **Defendant objects and moves to strike this paragraph on the ground that it exceeds the number of facts (80) allowable under Local Rule 56.1 without leave of court. Subject to and without waiving said objection, Defendant admits for purposes of summary judgment.**

95.    On March 11, 2012, in an email from Kathleen Wood of the Firearm [sic] Services Bureau, to Deanna Willner, with Mark Bayless and Linette Metzger copied, Kathleen Wood noted that the Plaintiff's "attorney requested a hearing last year, but did not receive a response." Ex. C, Def. Coffman Group Ex. No. 3, AGO Bates Stamp No. 90, 91.

**RESPONSE**: **Defendant objects and moves to strike this paragraph on the ground that it exceeds the number of facts (80) allowable under Local Rule 56.1 without leave of court. Subject to and without waiving said objection, Defendant admits for purposes of summary judgment.**

96.    No one in the Firearm [sic] Services Bureau, including Defendant Coffman,

Appendix P.54

completed a document review on the Plaintiff's case. Ex. F, Def. Coffman Dep. 136, 138.

**RESPONSE**: **Defendant objects and moves to strike this paragraph on the ground that it exceeds the number of facts (80) allowable under Local Rule 56.1 without leave of court. Subject to and without waiving said objection, Defendant disputes. The citations provided by Plaintiff do not support this statement of fact.**

97.     In fact, Defendant Coffman denied having any knowledge of the Plaintiff's appeal. Ex. G, Def. Coffman Answer Pl. Interrog., Interrog. No. 10.

**RESPONSE**:  **Defendant objects and moves to strike this paragraph on the ground that it exceeds the number of facts (80) allowable under Local Rule 56.1 without leave of court. Subject to and without waiving said objection, Defendant disputes.  The information provided to Defendant by Plaintiff's attorney was placed in Plaintiff's file, and given the clear and present danger threat that Plaintiff had posed, requests for information/comments were sent to State Representative DeLuca's office, as well as to the relevant ISP Zone. (Doc. 67, Ex. A, Coffman Dep., 136:4-19). The ISP Bureau of Firearms Services then waited for information to be returned, and Defendant recalled there was still some issue with reinstating Plaintiff's FOID card. (Doc. 67, Ex. A, Coffman Dep., 136:19-22). ISP had received information from Representative DeLuca's office that Plaintiff had continued to make threats even after his FOID card had been revoked, which Defendant would consider in deciding whether to reinstate Plaintiff's FOID card. (Doc. 67, Ex. A, Coffman Dep., 147:6-10, 150:1-17).**

**Plaintiff's FOID Card Reinstated and Firearms Returned**

98.     After getting no response from Defendant Coffman or the Firearm [sic] Services Bureau, on April 12, 2012, the Plaintiff initiated a lawsuit in the Circuit Court of Cook County in order have his FOID card privileges reinstated and weapons returned. Ex. H, Def. Coffman Dep. Group Ex. No. 2, 2-5.

Appendix P.55

**RESPONSE**:  **Defendant objects and moves to strike this paragraph on the ground that it exceeds the number of facts (80) allowable under Local Rule 56.1 without leave of court. Subject to and without waiving said objection, Defendant admits that Plaintiff initiated a lawsuit in the Circuit Court of Cook County to reinstate his FOID card, but disputes that Defendant Coffman was personally involved at ISP in the reinstatement process after early February 2012. (Doc. 67, Ex. A, Coffman Dep., 145:23-146:2).**

99.     On June 5, 2012, a letter was signed by Firearm [sic] Services Bureau Chief Jessica L. Trame[5] reinstating the Plaintiff's eligibility to retain a FOID card. Ex. C, Def. Coffman Group Ex. No. 3, AGO Bates Stamp No. 98.

**RESPONSE**:  **Defendant objects and moves to strike this paragraph on the ground that it exceeds the number of facts (80) allowable under Local Rule 56.1 without leave of court. Subject to and without waiving said objection, Defendant admits for purposes of summary judgment.**

100. On June 6, 2012, this letter was faxed to Assistant State's Attorney Nichole Patton by Sergeant Mark Bayless. Ex. C, Def. Coffman Group Ex. No. 3, AGO Bates Stamp No. 100-101.

**RESPONSE**:  **Defendant objects and moves to strike this paragraph on the ground that it exceeds the number of facts (80) allowable under Local Rule 56.1 without leave of court. Subject to and without waiving said objection, Defendant admits for purposes of summary judgment.**

101.     The Plaintiff's firearms were returned on August 29, 2012. Ex. A, Pl. Affidavit.

---

[5]Jessica L. Trame took over Defendant Coffman's position after his retirement.
**RESPONSE**: **Defendant objects and moves to strike this footnote on the ground that it exceeds the number of facts (80) allowable under Local Rule 56.1 without leave of court. Subject to and without waiving said objection, Defendant disputes. Defendant Coffman left his position with the Firearms Services Bureau in February 2012, but did not retire from ISP at that time. (Doc. 67, Ex. A, Coffman Dep., 145:23-146:2).**

Appendix P.56

**RESPONSE**: **Defendant objects and moves to strike this paragraph on the ground that it exceeds the number of facts (80) allowable under Local Rule 56.1 without leave of court. Subject to and without waiving said objection, Defendant admits for purposes of summary judgment.**

LISA MADIGAN
Attorney General of Illinois

Respectfully submitted,

/s/ *Sunil Bhave*
Sunil Bhave
Assistant Attorney General
Office of the Illinois Attorney General
100 West Randolph Street, 13th Floor
Chicago, Illinois 60601
(312) 814-4450

### CERTIFICATE OF SERVICE

I, Sunil Bhave, hereby certify that I have caused true and correct copies of the above and foregoing Response to Plaintiff's 56.1 Statement of Undisputed Facts to be sent via e-filing to all counsel of record on October 13, 2014, in accordance with the rules on electronic filing of documents.

/s/ *Sunil Bhave*
Sunil Bhave
Assistant Attorney General

Appendix P.57